# EXHIBIT C



Filed and Attested by the
Office of Judicial Records
14 MAR 2025 10:41 am
E. RICE

KINDRED HOSPITALS EAST, LLC d/b/a :
KINDRED HOSPITAL – PHILADELPHIA :
and d/b/a KINDRED HOSPITAL – HAVERTOWN: :
 

*Plaintiff* :

vs. :

KEYSTONE FAMILY HEALTH PLAN :

*Defendant.* :

**COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA**

**DOCKET NO. 250200219**

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| **You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.** | **Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.** |
| *You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.* | *Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.* |
| **Philadelphia Bar Association<br>Lawyer Referral<br>and Information Service<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197** | **Asociacion De Licenciados<br>De Filadelfia<br>Servicio De Referencia E<br>Informacion Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197** |

**BONI, ZACK & SNYDER LLC**
Benjamin J. Eichel (Pa. No. 307078)
beichel@bonizack.com
15 St. Asaphs Road
Bala Cynwyd, PA 19004
*Attorneys for Plaintiff Kindred Hospitals East, LLC*
*d/b/a Kindred Hospital – Philadelphia and Kindred*
*Hospital - Havertown*

| | |
|---|---|
| _____ : | |
| KINDRED HOSPITALS EAST, LLC d/b/a : | |
| KINDRED HOSPITAL – PHILADELPHIA : | |
| and d/b/a KINDRED HOSPITAL – HAVERTOWN: | |
| : | **COURT OF COMMON PLEAS** |
| *Plaintiff* : | **PHILADELPHIA COUNTY,** |
| vs. : | **PENNSYLVANIA** |
| : | |
| KEYSTONE FAMILY HEALTH PLAN : | **DOCKET NO. 250200219** |
| : | |
| *Defendant.* : | |
| _____ : | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## PARTIES

1.      Kindred Hospitals East, LLC d/b/a Kindred Hospital – Philadelphia and d/b/a

Kindred Hospital – Havertown ("Kindred") is a limited liability company doing business in

Philadelphia, Pennsylvania.

2.      Upon information and belief, Keystone Family Health Plan ("Keystone") is a

Pennsylvania general partnership with its principal place of business in Philadelphia,

Pennsylvania.

## JURISDICTION AND VENUE

3.      The Court has personal jurisdiction over Keystone pursuant to 42 PA Cons Stat. §

5301(a)(3) because Keystone is a Pennsylvania general partnership formed under the laws of the

Commonwealth that carries on a systematic part of its business in the Commonwealth.

4.      Venue is proper in this Court pursuant to Pa. R. Civ. P. 2179 because Keystone's principal place of business is located in Philadelphia County, Keystone regularly conducts business in Philadelphia County, and a substantial portion of the facts giving rise to the claims occurred in this judicial district.

## **NATURE OF THE ACTION**

5.      This action arises out of Keystone's failure to pay Kindred in full for hospital services it provided to eighteen (18) individuals insured by Keystone health plans (collectively, the "Insureds," and individually identified by number (*e.g.*, "Insured 1," "Insured 2," etc.).[1]

6.      Kindred operates Kindred Hospital Philadelphia and Kindred Hospital Havertown within the Commonwealth. Kindred's hospitals are long term acute care ("LTAC") hospitals, which have average lengths of stay in excess of 25 days, caring for the sickest of the sick and providing acute care and treatment to patients who continue to require it after admission at short term acute care hospitals not equipped to handle prolonged hospital admissions.

7.      Verifying coverage prior to admission is something Kindred does in the ordinary course of business.  Kindred does this to ensure there is a viable payor source and the amount of payment that can reasonably be expected before admitting and treating any patient since it is not required to admit any patient.

8.      In reliance on Keystone's verification of coverage and authorization for admission, as well as a written contract between the parties, Kindred admitted the Insureds and provided them with medically necessary acute care and treatment. Nonetheless, Keystone arbitrarily cut off coverage for the Insureds while they were both actively receiving medically necessary LTAC care and treatment, failed to pay for Kindred's care at the correct rates, subjected Kindred's claims to

---

[1] For reasons of patient privacy, the Insureds are not identified by name in this Complaint. Kindred will disclose the name of the Insureds to Keystone or the Court upon request.

Case ID: 250200219

arbitrary and unauthorized charge-stripping and post-claims underwriting, and concocted specious reasons to deny payment for Kindred's specifically authorized care and treatment.

9.     As a result of Keystone's wrongful conduct with respect to Kindred and the Insureds, Kindred has sustained substantial pecuniary damages in excess of $1,390,000.00.

10.     With respect to all disputes addressed below, in addition to its appeals, Kindred has undertaken exhaustive efforts, on its own and through counsel, to try and obtain the expected reimbursement. While Keystone agreed to pay certain claims as to other patients in whole or in part, however, it refused to retreat from its improvident positions with respect to the patients discussed below, leaving Kindred with no option but to file this complaint.

## FACTS

11.     Keystone contracts with the Centers for Medicare and Medicaid Services ("CMS") to provide medical care and treatment to Medicare beneficiaries who sign up for its Medicare Advantage plans.

12.     Keystone also contracts with the Pennsylvania Department of Human Services ("DHS") to provide medical care and treatment to Medicaid beneficiaries who sign up for its managed care plans (its "Medicaid" plans) under the Commonwealth's Medical Assistance program.  As a Medicaid plan, Keystone has an obligation to provide its Medicaid insureds with health care services. Medicaid members are economically disadvantaged and are among the most vulnerable in society, including many individuals with drug addictions and/or who are homeless.

13.     As a health care service plan in Pennsylvania, Keystone is obligated to comply with the Health Maintenance Organization Act, 40 P.S. §§ 1551, *et seq.*

14.     Among other obligations under the Health Maintenance Organization Act, Keystone must provide basic health services, including inpatient hospital care, to enrolled individuals (either directly or through arrangements with others), and comply with the Unfair

Case ID: 250200219

Insurance Practices Act, 40 P.S. 1171.1 *et seq*.

15.     Because the risk of payment is on Keystone, it contracts with providers to supply medical treatment to its insureds and enrollees at a discounted rate.

16.     Since Keystone receives payments from CMS and DHS each month for each of its enrollees, one way in which it is able to increase its revenue is to delay or deny payment to the medical and hospital providers that care for its insureds and thereby earn money on the "float."

17.     In other words, Keystone receives millions of dollars by investing advance payments of taxpayer funds provided to it to pay the health care claims of its insureds. The longer Keystone can hold on to these amounts before it pays those providers – if it ever pays those providers – the greater the returns from investing those funds.

18.     The Office of Inspector General ("OIG") has recently issued reports, in 2022 and 2023, expressing concern about Medicare and Medicaid plans because of this perverse incentive. As stated by the OIG in its 2022 report on Medicare plans, "[a] central concern about the capitated payment model used in Medicare Advantage is the potential incentive for Medicare Advantage Organizations to deny beneficiary access to services and deny payments to providers in an attempt to increase profits."  The same concern was expressed in the OIG's 2023 report on Medicaid plans.

19.     Effective July 1, 2019, Kindred and Keystone entered into a Hospital Services Agreement (the "Agreement") drafted by Keystone. A copy of the Agreement, and relevant amendments thereto, with payment rates redacted, is attached as **<u>Exhibit 1</u>**.

20.     Pursuant to the Agreement, Kindred was to provide medical services to Keystone insureds who were covered by Medicare Advantage or Medicaid plans, and Keystone was to pay Kindred in accordance with the terms of that agreement.

21.     The Agreement defines a service as "Medically Necessary" "if it is compensable under the Medical Assistance program and meets any one of the following standards:

Case ID: 250200219

(a) The service or benefit will, or is reasonably expected to, prevent the onset of an illness, condition or disability;

(b) The service or benefit will, or is reasonably expected to, reduce or ameliorate the physical, mental or developmental effects of an illness, condition, injury or disability; or

(c) The service or benefit will assist the Member to achieve or maintain maximum functional capacity in performing daily activities, taking into account both the functional capacity of the Member and those functional capacities that are appropriate for Members of the same age." Agreement, § 1.12.

22.     Medicare Advantage Plans are required to pay the same benefits as original Medicare. *See* 42 C.F.R. 422.100(a) and (c).

23.     Once a patient is admitted at Kindred, Kindred cannot discharge the patient without a safe discharge option and a physician discharge order.

24.     Unless an LTAC hospital ("LTACH") has a safe discharge option for a patient and a physician discharge order, the LTACH's care for such patient is, by definition, medically necessary.

25.     In that regard, continued stay criteria under either InterQual or Milliman LTAC guidelines (two level of care guidelines used to assess medical necessity of care) are met if discharge screens are not met, and discharge screens are not met unless there is in fact, and not just in theory, an available safe discharge option.

26.     As detailed below, Kindred provided medically necessary hospital care and treatment for which it has not been paid in full to 18 patients covered by Keystone plans.

### *Statement of Facts concerning Insured 1*

27.     Prior to the admission of Insured 1 to Kindred Hospital Philadelphia on August 10, 2021, Kindred verified he was covered by an active Keystone First Community HealthChoices

Case ID: 250200219

Medicaid plan, and further verified it was an in-network provider through the Agreement, pursuant to which Kindred would be paid the per diem rates set forth therein.

28.     Kindred also sought and obtained pre-authorization to admit Insured 1 under authorization number 92108018821. In reliance upon this verification of coverage and payment, as well as Keystone's authorization, Kindred admitted Insured 1 and began providing him with care and treatment.

29.     Kindred submitted regular clinical updates to Keystone in the ordinary course, and Keystone authorized continued care and treatment through December 22, 2021, denying further authorization on the grounds of a purported lack of medical necessity.

30.     Kindred submitted several clinical appeals of Keystone's authorization denial, but did not hear from Keystone until August 2022. At that time, Keystone stated that Kindred's appeals did not present an appealable issue because the Insured was still inpatient at Kindred's hospital.

31.     Never having heard of such an approach to clinical denials and appeals, Kindred promptly inquired with Keystone, with Kim Cross of Keystone confirming that Keystone's policy was that its appeals department did not review appeals while insureds were still inpatient, and therefore Kindred could not appeal the authorization denials until Insured 1 had been discharged.

32.     Accordingly, Kindred waited until after Insured 1's December 23, 2022, discharge to submit its first level clinical appeal for dates of service December 23, 2021, through December 22, 2022. Kindred's appeal provided a comprehensive, detailed, and sometimes daily breakdown of Kindred's care and treatment of Insured 1 during the denied dates of service and how it met LTAC criteria for continuing admission.

Case ID: 250200219

33.    In response, on March 6, 2023, Keystone partially overturned its denials and authorized specific dates of service. More specifically, Keystone overturned its prior denials as to the following dates of service:

- 12/29/21 – 1/2/22
- 1/19/22 – 1/25/22
- 1/29/22 – 2/5/22
- 4/3/22 – 4/13/22
- 5/2/22 – 5/15/22
- 8/30/22 – 9/5/22

34.    However, Keystone upheld its previous denials as to all other denied dates of service, ultimately denying authorization for a staggering 312 dates of service. Kindred submitted a second level clinical appeal, but Keystone upheld its previous decision.

35.    Keystone's denials are wrong, as Insured 1's care and treatment was medically necessary at the LTAC level of care on all dates of service. In that regard, Insured 1 was a medically complex man who was admitted to Kindred following acute respiratory failure secondary to hemorrhagic CVA, requiring ventilator management, dialysis, complex wound care, and other medical management and monitoring.

36.    Throughout the denied dates of service, Insured 1 required changing medications to treat specific conditions, and ongoing diagnostic testing to investigate the causes of specific conditions, which is clearly LTAC hospital level care and could not be provided in a lower-level of care facility.

37.    Furthermore, Keystone previously stated that many of Insured 1's clinical conditions were grounds for overturning its original denials when it approved payment for services provided both before and after the denied dates of service. For example, when overturning its denials for January 29 through February 5, 2022, May 2 through 15, 2022, and August 30 through

Case ID: 250200219

September 5, 2022, Keystone stated as grounds for overturning its denial that Insured 1 "required anti-infective for pneumonia," which he also received during the denied dates at issue.

38. Similarly, in overturning its denials for services provided from January 19 through 25, 2022 and August 30 through September 5, 2022, Keystone noted Insured 1 had elevated temperatures above 99.4, which again occurred during many of the dates for which Keystone upheld its errant authorization denials.

39. Numerous additional examples exist, but it is incomprehensible that Keystone could review clinical records that document the same issues which proved medically necessary LTAC care for the overturned dates (*e.g.* – elevated temperatures and antibiotics) and determine that there was no medical necessity during the intervening and surrounding periods, even though the same medical conditions persisted and/or recurred on an ongoing basis.

40. Going further, Keystone's ostensible policy to not review clinical appeals in the ordinary course and instead force providers to wait until after discharge to appeal does not give Keystone license to arbitrarily pick and choose the smallest chunks of time to retroactively authorize as medically necessary. Doing so does not align with the practical realities of LTAC hospital care, and such an approach inappropriately takes such dates of service out of the context of Insured 1's entire admission.

41. Indeed, based on the dates of service Keystone ultimately approved, Keystone's position appears to be that Kindred should have discharged Insured 1 (assuming an acceptable placement could have been found) no less than six separate times, only to re-admit him mere days or weeks later.

42. Such a pattern of hospital admissions and discharges would amount to multiple failures at lower levels of care. Failures at lower levels of care not only increase costs, including

Case ID: 250200219

Keystone's costs, as patients are often re-admitted to short term acute care hospitals via the emergency room, but they are also clearly contrary to best clinical practices as they increase the risk of bad health outcomes to the patients who have to suffer through them.

43.     This inherent instability and the fact that Insured 1's complex condition fluctuated so frequently demonstrates that he was not appropriate for discharge to lower level of care. Indeed, had discharge been possible, he would have soon returned to a short-term acute care hospital and ended up back at Kindred anyway.

44.     Beyond the clear medical necessity of his care, however, Insured 1's complex condition, including numerous comorbidities, further complicated his treatment and ultimately prevented his discharge to a lower level of care.

45.     More specifically, and by way of example, Insured 1's tracheostomy, history of cancer, and need for regular dialysis represented constant barriers to discharge as no accepting facilities that could meet such needs were available. In fact, throughout the denied dates of service, Kindred contacted numerous facilities in Pennsylvania, New Jersey, Maryland, and Ohio, but none agreed to accept him.

46.     As Keystone knows, an LTACH like Kindred cannot discharge a patient without both a safe discharge option and a physician's discharge order. Without both, discharge screens are not met and continuing stay criteria is *ipso facto* met under either Milliman or InterQual guidelines. For this reason as well, all of Kindred's care and treatment of Insured 1 was medically necessary and Keystone must pay for same.

47.     Finally, pursuant to Schedule A-1 of the of the Agreement, "[Keystone] agrees that if [Kindred] cooperates with [Keystone] through its Participating Health Care Providers and [Keystone's] utilization management staff to coordinate discharge planning of Covered Persons

Case ID: 250200219

and cannot find a network or approved out of network option willing to accept the patient then [Keystone] will continue to reimburse Hospital at the agreed upon rate in this Attachment until [Kindred] and/or Keystone finds an appropriate network or approved out of network discharge option."

48.     At all times, Kindred cooperated with Keystone and its utilization management staff with respect to discharging Insured 1 to a lower level of care facility. To that end, as mentioned, Kindred's case manager made numerous referrals to skilled nursing facilities in four different states. Ultimately, however, no safe and accepting discharge option could be found.

49.     Keystone is thus obligated under the Agreement to reimburse Kindred at the contract rate for all dates of service between December 22, 2021, and December 23, 2022, for which it owes Kindred an additional *$576,800.00*, along with interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 2*

50.     Prior to Insured 2's admission to Kindred Hospital Philadelphia on April 24, 2020, Kindred verified he had an active Keystone First Community HealthChoices Medicaid plan as primary coverage. Keystone further pre-authorized his admission and dates of service through May 22, 2020. Based upon this verification of coverage and authorization of admission, Kindred admitted Insured 2 and began providing him with care and treatment.

51.     Kindred regularly sent updated clinical information to Keystone and sought continued authorization for Insured 2's care and treatment, which Keystone either provided or failed to respond at all.

52.     After discharge, on June 25, 2020, Kindred billed its admit to discharge claim for Insured 2's care and treatment in the ordinary course. Keystone, however, only paid for 44 dates

Case ID: 250200219

of service, denying payment for the other 18 days due to an ostensible lack of authorization. Never having received an authorization denial, Kindred thereafter investigated and was told for the first time by Keystone that authorization was denied from June 6, 2020, forward. During that call, Kindred also requested a copy of the denial letter from Keystone.

53. Upon receiving the denial letter, Kindred promptly submitted a timely clinical appeal, which Keystone nevertheless denied as untimely. This was wrong, as Kindred submitted its clinical appeal promptly after receiving Keystone's denial letter.

54. In any event, Keystone should not have denied authorization in the first place, as Kindred's care and treatment of Insured 2 was medically necessary at the LTAC level of care during the entire admission.

55. Indeed, just before the ostensible denial date of June 6, 2020, Insured 2 had a change of condition that required Insured 2 to return to full ventilator support with a need for weaning, along with a new infection that required multiple intravenous ("IV") antibiotics, recurrent fevers thought to be central fevers, and significant barriers to discharge – many of which were due to the then-raging Covid-19 pandemic.

56. Quite clearly, Insured 2 met criteria for LTAC level of care throughout the admission. As mentioned, however, Insured 2 also had recurrent fevers that complicated his potential discharge because lower level facilities were reluctant to accept him while he suffered from fevers, even though he twice tested negative for Covid-19.

57. Kindred even went so far as to adjust his medication to try and control the fevers and facilitate a discharge, and achieved some moderate success in that regard, but on the day he was originally supposed to discharge, he suffered another fever, delaying his discharge again.

Case ID: 250200219

58.     In short, although it is clear Insured 2 met criteria for continuing admission under both InterQual and Milliman guidelines during the denied dates of service, pursuant to the aforementioned Schedule A-1 of the Agreement, Keystone is also contractually bound to pay for Kindred's care while it diligently worked to discharge Insured 2 in any event.

59.     Keystone owes Kindred an additional *$25,200*.00 for the medically necessary care and treatment provided to Insured 2, along with interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 3*

60.     Prior to Insured 3's July 5, 2019, admission to Kindred Hospital Philadelphia, Kindred verified his insurance coverage, which showed he had a Cigna Medicare Advantage plan as primary coverage (with 60 Part A hospital days remaining) and a Keystone First Community HealthChoices Medicaid plan as secondary coverage.

61.     When Kindred sought to obtain authorization from Cigna, however, it was told that Insured 3's Cigna Part A hospital benefits had in fact exhausted. Kindred thereafter sought authorization from Keystone for Insured 3's care and treatment, which Keystone granted.

62.     In reliance upon Keystone's verification of coverage and authorization, Kindred admitted Insured 3 and provided him with medically necessary care and treatment until his discharge on August 9, 2019.

63.     Kindred submitted regular clinical updates to Keystone and Keystone continued to authorize Kindred's care and treatment through August 1, 2019, denying authorization for dates of service August 2 through 9, 2019, for a purported lack of medical necessity.

64.     After Insured 3's discharge, Kindred billed its admit-to-discharge claim to Keystone and around the same time, submitted a clinical appeal for the unauthorized dates of

Case ID: 250200219

service through Praxis Healthcare Systems ("Praxis"), a third party vendor Kindred used at the time.

65.    However, Keystone denied payment for the authorized dates of service and denied the clinical appeal as well – contending Kindred's claim was not submitted with the exhaust explanation of benefits ("EOB") from Cigna, and that Kindred's clinical appeal was not timely.

66.    This was incorrect. First, no exhaust EOB from Cigna existed, because Cigna had expressly advised Kindred prior to admission that Insured 3's hospital days had exhausted. Thus, Kindred did not, and had no reason to, bill Cigna for Insured 3's care and treatment, which would have been necessary to produce an exhaust EOB.

67.    In any event, there is no dispute that Insured 3's Cigna hospital benefits had exhausted prior to his Kindred admission and that Keystone was therefore the responsible insurer. Keystone's refusal to pay Kindred for the expressly authorized dates of service (July 5 through August 1, 2019) on grounds that it did not receive an exhaust EOB from Cigna is not a valid basis to deny payment for care and treatment it specifically authorized and for which there is no dispute it is financially responsible.

68.    Regarding Kindred's clinical appeal, it was submitted before Kindred even received Keystone's EOB denying payment for the unauthorized dates of service and was therefore timely.

69.    Keystone was thus required to substantively review Kindred's clinical appeal, but to-date has refused to do so; this refusal occurred despite ongoing communications between the parties through late 2021, and through the parties' counsel through 2024, and Keystone's obligation to cover and pay for medically necessary care.

Case ID: 250200219

70.     Had Keystone done so, it would have recognized that Insured 3's care and treatment during the denied dates of service was medically necessary at the LTAC level of care, and that Keystone was therefore obligated to pay Kindred for such care.

71.     Keystone owes Kindred an additional *$50,400.00* for its medically necessary care and treatment of Insured 3, plus interest as allowed under Pennsylvania law.

### ***Statement of Facts concerning Insured 4***

72.     Upon Insured 4's December 29, 2020, admission to Kindred Hospital Havertown, Kindred determined Insured 4 had Medicare Parts A and B as primary coverage, and a Keystone First Community HealthChoices Medicaid plan as secondary.

73.     Shortly after her discharge, on February 4, 2021, Kindred re-verified Insured 4's coverage and learned that in fact, Insured 4 did not have Medicare Part A hospital benefits, but instead her Keystone plan was primary coverage with Medicare Part B as secondary coverage. Kindred subsequently billed Keystone and Medicare Part B accordingly.

74.     Keystone, however, errantly denied Kindred's claim for timely filing and the Part B coinsurance claim for "invalid billing," both of which were not correct.

75.     First, Kindred's claim was submitted well within 180 days from Insured 4's discharge, as allowed by Section 2.6 of the Agreement.

76.     It appears Keystone's denial stemmed from a mistaken belief that Insured 4 had Medicare Part A benefits as primary, and that Kindred's claim came more than 60 days after a Medicare Part A EOB denial. As Kindred pointed out to Keystone's representatives at the time, however, that belief was incorrect. Insured 4 never had Part A benefits during her admission and Keystone was therefore the primary insurer from the outset of her Kindred admission.

Case ID: 250200219

77.     Indeed, Keystone acknowledged the fact that Insured 4 did not have Medicare Part A benefits in a December 16, 2021, letter. Keystone nevertheless maintained its denial of payment on the grounds Insured 4 had Medicare Part A benefits despite its own acknowledgement to the contrary.

78.     Making matters worse, Kindred, both on its own and through Praxis, appealed and followed up with Keystone numerous times regarding this improper claim denial – and even provided Medicare Part B EOBs and Medicare eligibility documents to Keystone to demonstrate Keystone's error and get Kindred's claim processed and paid.

79.     For an inpatient hospital stay like the one at issue here, Medicare Part B, which is used to pay physician charges and outpatient costs, does not pay for any of the costs of an inpatient hospital stay. The sole exception to this rule is when Part A benefits exhaust or Part A benefits are otherwise unavailable. At that point – and only at that point – Part B will pay for certain ancillaries, like x-rays and therapy, for patients who are hospitalized.

80.     As stated in the Medicare Benefit Policy Manual, Chapter 6, Section 10:

*In all hospitals, every service provided to a hospital inpatient other than those listed in the next paragraph must be treated as an inpatient hospital service to be paid for under Part A, if Part A coverage is available and the beneficiary is entitled to Part A.  This is because every hospital must provide directly or arrange for any nonphysician service rendered to its inpatients, and a hospital can be paid under Part B for a service provided in this manner **only if Part A coverage does not exist**. (emphasis added)*

81.     In other words, Medicare Part B will not pay any amount unless Part A coverage is not available. Thus, the fact that Medicare Part B paid for ancillary charges here conclusively demonstrates that Insured 4 did not have Medicare Part A benefits during her Kindred admission.

82.     Given that Kindred has not received payment for the inpatient hospital care and treatment provided to Insured 4, including, among other things, room and board charges and

Case ID: 250200219

pharmacy charges not reimbursed by Part B, Keystone's Medicaid plan is required to pay Kindred for said care and treatment.

83.     The foregoing efforts from Kindred, however, were futile, and Keystone has continued to refuse payment.

84.     Keystone's denial of the Medicare Part B coinsurance claim was also wrong. Kindred initially billed it as an interim claim, which is normal for Medicare Part B, but Keystone denied it claiming that interim billing was invalid. Then, Kindred billed the Part B coinsurance claim as admit-to-discharge, as Keystone requested, but Keystone still did not pay.

85.     This too, is incorrect and improper.

86.     Keystone owes Kindred *$88,396.57*, plus interest as allowed under Pennsylvania law, for Kindred's care and treatment of Insured 4.

### ***Statement of Facts concerning Insured 5***

87.     Prior to Insured 5's November 19, 2020, admission to Kindred Hospital Havertown, Kindred verified his insurance, which showed he had original Medicare as primary coverage, and an active Keystone First Community HealthChoices Medicaid plan as secondary coverage. Based upon this verification of coverage, Kindred admitted Insured 5 and began providing him with care and treatment.

88.     After his admission, Kindred learned that Insured 5's Medicare Part A hospital benefits had exhausted prior to admission, making Keystone the primary insurer for the entire time Insured 5 was inpatient.

89.     Kindred billed its exhaust claim to original Medicare in the ordinary course, and the claim crossed over automatically to Keystone. However, Keystone denied the crossover claim.

Case ID: 250200219

90.     Kindred thereafter submitted an admit to discharge claim to Keystone with the Medicare exhaust paperwork, but Keystone stated the claim was not on file. Kindred then resubmitted the claim and exhaust paperwork via certified mail, which were delivered on May 24, 2021. However, despite the resubmission and delivery confirmation, Keystone continued to insist the claim was not on file and prompted Kindred, through vendor Praxis, to initiate a claim investigation request through Navinet to locate and process the claim.

91.     Finally, in November 2021, Keystone acknowledged that it had located the claim "several times," and would be escalating it to a supervisor to get a resolution. Pursuant to this escalation, rather than processing and paying Kindred's claim, Keystone told Kindred for the first time that its claim submissions that Keystone acknowledged receiving had allegedly been returned for including an invalid original claim number, and that Keystone had purportedly sent letters to Kindred to that effect. When Kindred advised that no such letters had been received, a Keystone representative emailed copies of the alleged letters to Kindred on December 6, 2021.

92.     Following its receipt of Keystone's letters, Kindred submitted a bill type 117 claim several more times, with Keystone denying each bill for varying and specious reasons, none of which were correct. This led Keystone's own representatives to acknowledge Keystone's errors and agree to resubmit Kindred's claim for reprocessing. When this effort did not result in payment either, a Keystone representative then instructed Kindred to submit yet another claim together with all Medicare remittances and that when Kindred did so, to let the Keystone representative know so she could override any timely filing denial.

93.     Kindred again did as instructed and submitted the claim with all Medicare remittances, but instead of overriding the predicted timely filing denial as promised, Keystone's representative told Kindred that her "leadership" would not let her do the override, leaving Kindred

Case ID: 250200219

completely unpaid for the medically necessary care and treatment it provided in good faith to Insured 5.

94. Keystone owes Kindred *$67,612.07* for the medically necessary care and treatment of Insured 5, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 6*

95. Prior to Insured 6's January 20, 2021, admission to Kindred Hospital Philadelphia, Kindred verified that he had an active Keystone First VIP Choice Medicare Advantage HMO as primary coverage, and a Keystone First Community HealthChoices Managed Medicaid HMO as secondary coverage. Kindred further sought and obtained authorization to admit Insured 6 from Keystone under authorization number 2101025558, and pursuant to such representations of coverage and authorization, admitted and began treating him. Keystone subsequently authorized all dates of service.

96. Kindred submitted an admit to discharge claim in the ordinary course, expecting reimbursement of $94,643.14 in accordance with the parties' Agreement, but Keystone paid Kindred only $77,687.01 with $9,646.00 in coinsurance that Kindred expected Insured Boyd's Keystone Medicaid coverage to reimburse.

97. Thus, Keystone's Medicare Advantage plan underpaid Kindred by $7,310.13. When Kindred followed up to inquire regarding the underpayment, Keystone instructed Kindred to bill a 117 claim and include an itemized bill, and Kindred did as instructed.

98. In response, however, Keystone did not remedy the underpayment, and after more than a year with multiple appeals and regular follow-up, Keystone finally informed Kindred that the underpayment was the result of a purported "claim review" performed by third-party Equian, which resulted in the removal of $44,385.00 in billed charges from Kindred's claim.

Case ID: 250200219

99.     Never having received anything from Equian when the charges were removed, Kindred was finally given a copy of Equian's "review" in November 2022, which was entirely wrong.

100.     First and foremost, the removal (or stripping) of charges from Kindred's claims is not allowed by the Agreement and certainly was not consented to by Kindred. Notably, the Agreement does not allow for unilateral reductions on the basis that services were "routine care," "bundled," or otherwise, and nowhere in the Agreement does it state that Keystone can subject Kindred's claims to unauthorized claim reviews by third parties and pay a percentage of only those charges it wishes to pay.

101.     Instead, the Agreement expressly requires Keystone to pay at the Medicare rates for care and treatment rendered to a Medicare Advantage enrollee like Insured 6. *See* Agreement at Attachment MA-2.

102.     Second, no basis exists for the ostensible removal of over $44,000 in charges by Equian. Equian never asserted that the charges were for services not performed or that the charges otherwise were not incurred. Nor did Equian contend that the charges were for services not covered under Medicare. Instead, Equian's basis for removal appears to be its conclusory claim that the stripped charges were "routine" and inclusive to a billed service or procedure, and therefore should not have been billed at all.

103.     Equian is simply wrong. As Kindred detailed in its appeal, all of Kindred's itemized charges were subject to separate physician's orders – they were not "routine" supplies that were part of floor stock or procedure kits, as alleged or implied by Equian, or otherwise inclusive to other services. This fact was easily verifiable by Kindred's medical records that were provided to

Case ID: 250200219

Keystone and Equian. As such, the charges were properly billed individually and should never have been removed in the first place.

104.     Furthermore, upon information and belief, Equian was paid on a contingency basis for any "savings" it was able to obtain for Keystone in this manner. Given its financial incentive to do so, it is not surprising that Equian found excuses to strip charges from Kindred's billed charges and thereby lower the payment to Kindred.

105.     However, not only is Keystone's retention of Equian for the specific purpose of trying to reduce its contractual obligations nowhere permitted by the Agreement, but no Medicare regulations or guidance actually support Equian's position either.

106.     Keystone owes Kindred an additional *$7,310.13* for the medically necessary care and treatment of Insured 6, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 7*

107.     Prior to Insured 7's October 10, 2022, admission to Kindred Hospital Philadelphia, Kindred verified that he had an active Keystone First VIP Choice Medicare Advantage HMO as primary coverage, and a Keystone First Community HealthChoices Managed Medicaid HMO as secondary. Kindred further sought and obtained authorization to admit Insured 7 from Keystone under authorization number 92210019509, and pursuant to such representations of coverage and authorization, admitted and began treating him. Keystone subsequently authorized all dates of service.

108.     Kindred submitted its claims in the ordinary course, but once again Keystone improperly subjected Kindred's billed charges to improper and inaccurate charge-stripping under the guise of a "claim review," this time by Optum.

Case ID: 250200219

109.    Pursuant to its "review," Optum stripped an astonishing $455,252.01 in billed charges, resulting in an underpayment of $65,901.75. Kindred submitted an appeal demonstrating the absurdity of Optum's position, but no response was received.

110.    As established above, Keystone has no right to subject Kindred's claims to charge stripping prior to payment, but even if it did, Optum's efforts were woefully inaccurate with respect to Kindred's claims for Insured 7's care and treatment.

111.    This is evidenced by, among other things, the removal of a shocking $143,264.00 in respiratory care charges and the separate removal of $255,737.90 in billed charges by adjusting Kindred's room and board charges to what Optum calls the "base rate for the revenue code," whatever that is supposed to mean.

112.    As Keystone knows, Insured 7 was inpatient for acute respiratory failure with hypoxia. To care for patients with such needs, Kindred employs respiratory therapists who formulate specific treatment plans for patients in conjunction with the treating physicians. Kindred's skilled respiratory therapists, unlike its nurses, do not render routine care to all Kindred patients, only care directed by a physician in accordance with a treatment plan for the specific patient at issue.

113.    In that regard, Kindred's respiratory therapists conduct an assessment of respiratory services required by a specific patient, if any, according to that patient's clinical needs at the outset of an admission. Because this assessment is provided to every patient, Kindred does not charge payors for that assessment. However, it does charge payors for the therapies provided by the respiratory therapist pursuant to a treatment plan that is developed by the respiratory therapist and then approved and ordered by the patient's physician.

Case ID: 250200219

114. Notably, CMS does not exclude Kindred's respiratory charges when it pays Kindred in connection with Medicare patients as Keystone has done here. Thus, Kindred's respiratory care charges are not "integral to the underlying room and board and/or respiratory support charges" as Optum contended. They were properly billed separately, and in fact, under CMS guidance, those charges could not have been included with the room and board charges.

115. Similarly, the base LTAC rate is what Kindred charged on its UB-04s, so it is unclear why Optum believed a different and significantly lower rate applied. In the absence of clarification, which Optum tellingly failed to provide, it appears that Optum simply made up a number it thought Kindred should have billed in order to maximize the amount of money it would "earn" through its arbitrary, unilateral, and improper reductions of Kindred's billed charges, which upon information and belief, it was given a percentage of by Keystone.

116. Keystone owes Kindred an additional *$65,901.75* for the medically necessary care and treatment of Insured 7, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 8*

117. Prior to Insured 8's July 30, 2021, admission to Kindred Hospital Philadelphia, Kindred confirmed with Keystone that he was covered by an active Keystone First VIP Choice plan and that Kindred would be paid in accordance with the Agreement. In reliance upon these representations, Kindred admitted and treated Insured 8 until he sadly passed away on December 8, 2021. Keystone subsequently authorized all dates of service under authorization number 9210707776.

118. Kindred billed its claims in the ordinary course and Keystone initially paid them in full, but later recouped $29,976.34, leaving Kindred underpaid.

Case ID: 250200219

119. Once again, this underpayment appears to be the result of improper charge-stripping done by Optum. Here, Optum removed over $124,000.00 in billed charges, the vast majority of which were respiratory care charges that again were incurred as part of a specific treatment plan developed by Kindred's respiratory therapists under the direction of Insured 8's treating physicians.

120. Kindred appealed, but Keystone continually stated that no appeal was on file despite resubmissions and diligent follow-up by Kindred until finally Optum acknowledged receipt and stated that it was awaiting clarifying information from Insured 8's plan. As of the date of this complaint, however, no response to the appeal has been received.

121. In any event, Optum's charge-stripping for this admission was improper for the same reasons discussed above.

122. Accordingly, Keystone owes Kindred an additional *$29,976.34* for its specifically authorized care and treatment of Insured 8, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 9*

123. Prior to Insured 9's July 15, 2022, admission to Kindred Hospital Havertown, Kindred confirmed with Keystone that she was covered by an active Keystone First VIP Choice plan and that Kindred would be paid in accordance with the Agreement. In reliance upon these representations, Kindred admitted and treated Insured 9 until she was discharged on September 21, 2022. Keystone subsequently authorized all dates of service under authorization number 92207027780.

124. Kindred billed its claims in the ordinary course and Keystone initially paid in full, only to later recoup $38,074.40, leaving Kindred underpaid.

23

Case ID: 250200219

125.     Once again, this underpayment was the result of improper charge-stripping done by Optum, specifically the removal of over $106,000.00 in billed charges, the vast majority of which again were respiratory care charges incurred as part of a specific treatment plan developed by Kindred's respiratory therapists under the direction of Insured 9's treating physicians.

126.     Kindred submitted two appeals, but Keystone summarily upheld its charge-stripping and resulting underpayment.

127.     For the reasons discussed above, Keystone's underpayment is improper and unjustified, and Keystone owes Kindred an additional *$38,074.40* for Insured 9's specifically authorized care and treatment.

### *Statement of Facts concerning Insured 10*

128.     Prior to Insured 10's February 26, 2021, admission to Kindred Hospital Philadelphia, Kindred confirmed he had coverage through an active Keystone First VIP Choice policy, that Kindred was an in-network provider, and that it would receive payment in accordance with the Agreement. Keystone also authorized Insured 10's admission and all dates of service under authorization number 2102035289.

129.     In reliance upon Keystone's representations of coverage and payment, Kindred admitted Insured 10 and provided him with care and treatment until he was discharged on July 16, 2021.

130.     Kindred billed its claims in the ordinary course, but once again Keystone underpaid Kindred after unauthorized and incorrect charge-stripping. Specifically, on behalf of Keystone, Equian removed over $77,000 in properly billed charges from Kindred's interim claim for dates of service February 26 through April 30, 2021.

131.     Kindred submitted an appeal, but Keystone summarily upheld its decision.

24

Case ID: 250200219

132. For the reasons already articulated, Keystone's charge-stripping of Kindred's claims is not allowed under the Agreement or applicable law, and is factually wrong in any event.

133. As such, Keystone must pay Kindred the additional *$11,969.83* owed for Kindred's specifically authorized care and treatment of Insured 10, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 11*

134. Prior to Insured 11's November 30, 2021, admission to Kindred Hospital Philadelphia, Kindred confirmed that he was covered by an active Cigna Medicare Advantage policy as primary coverage, and a Keystone First Community HealthChoices policy as secondary coverage. Cigna further pre-authorized Insured 11's admission.

135. In reliance on these representations, Kindred admitted Insured 11 and provided him with care and treatment until his discharge on May 12, 2022.

136. Insured 11 exhausted his Medicare Part A lifetime reserve days effective April 17, 2022, rendering Keystone the primary insurer beginning April 18, 2022.

137. Kindred billed its claim to Keystone accordingly, but Keystone denied the claim because the charges on the explanation of benefits from Cigna did not match the charges billed to Keystone.

138. Kindred thereafter attempted to bill another claim to Cigna so the charges matched, but Cigna denied the claim as untimely. This created further problems, because Cigna's denial was for timeliness, not a denial for benefits being exhausted, and Keystone refused to review and process Kindred's claims without an exhaust denial from Cigna.

139. Kindred included this dispute as part of a payer project with Keystone and provided an itemized bill to Keystone's provider representative upon request to facilitate having the claim

Case ID: 250200219

processed, but in November 2024, Keystone told Kindred it would not review the claims without a remittance from Cigna denying payment due to benefits being exhausted with charges that match those on Kindred's claim to Keystone.

140. Because, despite Kindred's diligent efforts, Cigna has thus far refused to review Kindred's second claim and provide such an exhaust denial, Kindred cannot provide Keystone with the documentation it purportedly needs to process and pay the care and treatment Kindred provided to Insured 11 when Keystone was the primary insurer. Insofar as there is no dispute that Insured 11's Cigna benefits exhausted and that Keystone was the primary insurer from April 18, 2022, forward, this is not a proper basis to deny payment for Kindred's care and treatment of Insured 11 in any event.

141. Kindred remains unpaid for the valuable care it provided to Insured 11 and for which Keystone is responsible for a trumped-up technical reason that makes no sense.

142. Keystone owes Kindred *$45,300.00* for the care and treatment provided to Insured 11 between April 18 and May 12, 2022, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 12*

143. Prior to Insured 12's September 12, 2023, admission to Kindred Hospital Philadelphia, Kindred confirmed that he was covered by an active Keystone First Community HealthChoices Managed Medicaid HMO as primary coverage. Kindred further sought and obtained authorization to admit Insured 12 from Keystone under authorization number 92309024038, and pursuant to such representations of coverage and authorization, admitted and treated him until his discharge on October 20, 2023. Keystone subsequently authorized all but the last three dates of service.

Case ID: 250200219

144. Kindred submitted its claims in the ordinary course, expecting $69,300 in reimbursement for its care and treatment of Insured 12, but Keystone denied the claim for a purportedly invalid diagnosis code.

145. Kindred internally investigated the denial and the coding on its claim, but because Keystone did not specify a specific code in its denial and the coding otherwise appeared correct, Kindred could not ascertain an issue with its claim.

146. Thus, it inquired further with Keystone's provider representative, who informed Kindred that diagnosis code S27329A (for unspecified lung contusion) was causing the denial.

147. However, Kindred was unable to obtain medical records from the treating physician to support a more specific code to identify which lung was contused and therefore submitted a 117 claim with the added remarks "UNABLE TO DET LAT 1," which, pursuant to CMS billing guidelines, was proper and should have allowed Kindred's claim to be processed and paid.

148. Keystone, however, denied the 117 claim on the same basis as the original denial. Kindred appealed, but Keystone denied the appeal.

149. Thereafter, in a further effort to avoid litigation, Kindred submitted the dispute as part of a special project with Keystone pursuant to which the parties purported to try and resolve disputes, but Keystone refused to act on the issue and upheld its nonpayment.

150. As such, Kindred remains unpaid for the authorized and valuable care it provided to Insured 12 and for which Keystone is responsible because of just one of many codes on its claim.

151. Keystone owes Kindred *$69,300.00* for the care and treatment provided to Insured 12, plus interest as allowed under Pennsylvania law.

Case ID: 250200219

## Statement of Facts concerning Insured 13

152.    Prior to Insured 13's October 19, 2021, admission to Kindred Hospital Philadelphia, Kindred confirmed that he was covered by an active Keystone First Community HealthChoices Managed Medicaid HMO as primary coverage. Kindred further sought and obtained authorization to admit Insured 13 from Keystone under authorization number 92110034436, and pursuant to such representations of coverage and authorization, admitted and treated him until he unfortunately passed away on August 6, 2022. Keystone authorized all care and treatment Kindred provided to Insured 13.

153.    Kindred submitted its claims in the ordinary course, but Keystone paid 64 dates of service billed with revenue code 120 at the ICU rate, resulting in an overpayment of $12,800. Keystone also paid 205 dates of service billed at revenue code 205 at the medical/surgical rate, which caused an underpayment of $41,000. Thus, on balance Keystone underpaid Kindred by $28,200.

154.    Kindred appealed and provided medical records that established its care was rendered at the level of care billed for the dates of service at issue, but after several months of "review" and regular follow-up from Kindred, Keystone errantly upheld its underpayment decision.

155.    Kindred submitted a second-level appeal, but it too was wrongly denied by Keystone.

156.    Keystone owes Kindred *$28,200.00* for the care and treatment provided to Insured 13, plus interest as allowed under Pennsylvania law.

Case ID: 250200219

## *Statement of Facts concerning Insured 14*

157.    Prior to Insured 14's December 2, 2022, admission to Kindred Hospital Philadelphia, Kindred confirmed that he was covered by original Medicare Part A as primary coverage, and a Keystone First Community HealthChoices policy as secondary coverage.

158.    In reliance on these representations, Kindred admitted Insured 14 and provided him with care and treatment until his discharge on February 24, 2023.

159.    Insured 14's Medicare Part A benefits exhausted effective December 10, 2022, rendering Keystone the primary insurer beginning December 11, 2022.

160.    Kindred billed Medicare in the ordinary course, and, given the exhaustion of Insured 14's Part A benefits, the claim automatically crossed over to Keystone. Keystone, however, once again rejected the crossover claim,

161.    Kindred therefore billed Keystone directly and included proof of the Medicare exhaust with its claim. In response, Keystone denied the claim for a purportedly invalid diagnosis code. Kindred followed up with Keystone regarding the denial and specifically inquired as to which code was allegedly invalid, but Keystone's representative could not identify the code for Kindred.

162.    Later, a different Keystone representative in its executive accounts department informed Kindred that one of the diagnosis codes on Kindred's claim apparently contained an incomplete number of digits.

163.    Kindred undertook its own internal investigation, pursuant to which it confirmed that the code identified by Keystone was in fact correct on Kindred's claim, and Keystone's denial was wrong. Thus, Kindred followed up again, at which point Keystone changed its position and said that the denial was allegedly because Kindred's claim was missing POA indicators, but that

Case ID: 250200219

the claim was still within timely filing and if Kindred updated it with POA indicators and resubmitted the claim, it would be processed for payment.

164.    Kindred did as instructed and submitted a 117 claim to Keystone with the requested POA indicators the same day. This time, however, Keystone denied the claim for lack of authorization.

165.    Thus, Kindred submitted a clinical appeal with medical records requesting retro-authorization for the dates of service when Keystone was the primary insurer. Incredibly, despite the fact that Kindred had submitted a 117 claim at Keystone's behest, Keystone nevertheless denied Kindred's appeal as untimely, contending that Kindred had 60 days from the claim denial to submit an appeal.

166.    However, Kindred did not receive Keystone's denial of Kindred's claim for lack of authorization until December 13, 2023, and Kindred submitted its appeal on February 9, 2024, or 58 days later. Thus, by Keystone's own arbitrary measure, Kindred's appeal was timely.

167.    In any event, such a technical basis is not valid grounds to deny Kindred payment for the valuable and medically necessary care rendered to Insured 14, for which Keystone was the responsible insurer.

168.    Keystone owes Kindred *$135,715.36* for the care and treatment provided to Insured 14 between December 11, 2022, and February 24, 2023, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 15*

169.    Prior to Insured 15's July 14, 2022, admission to Kindred Hospital Philadelphia, Kindred confirmed he was covered by an active Keystone First Medicaid policy as primary

Case ID: 250200219

coverage. Kindred further sought and obtained authorization to admit Insured 15 under authorization number 92207019313.

170.    In reliance upon Keystone's representations and authorization, Kindred admitted Insured 15 and began providing him with care and treatment. Kindred thereafter sent regular clinical updates to Keystone and Keystone continued to authorize all dates of service of Insured 15's care and treatment through his discharge on October 19, 2022.

171.    Kindred submitted its claims in the ordinary course, but Keystone issued a series of confusing and incorrect decisions on Kindred's claims.

172.    First, Keystone denied the first two dates of Insured 15's admission, July 14 and 15, as unauthorized, which was not true.

173.    Second, Keystone paid at the wrong level of care for multiple dates between July 16 and September 30.

174.    Third, Keystone denied Kindred's claim for dates of service October 1 through 19 as needing medical records. These confusing and incorrect decisions left Kindred underpaid by $51,900.00 - $19,500.00 due to its errant denial of the first two dates of service and improper payment at different levels of care than what was billed, and $32,400.00 due to not paying any amount for the October dates of service.

175.    Kindred appealed the improper denial of the first two dates of service and underpayments from Keystone's failure to pay at the appropriate level of care, but Keystone summarily upheld its incorrect decisions.

176.    With regard to the October dates of service, Kindred inquired with Keystone regarding the medical records request and was given a specific address to which the send the

31

Case ID: 250200219

records. Kindred did as instructed, only to later be told that Keystone could not locate them and that the records should be sent to a different address.

177. Kindred sent the records to the new address provided by Keystone, only for Keystone to again say they could not be found and instructed Kindred to send the records to Optum, a third party with no involvement with this patient. Yet, in an effort to get paid for the authorized care provided, Kindred nevertheless sent the records to Optum, who predictably later claimed that it did not request or need the records and had no record whatsoever of Insured 15.

178. Altogether, Kindred sent medical records for Insured 15 to Keystone at least four separate times and to addresses Keystone specifically provided, but to no avail. Eventually, this issue was added to a special payor project, but Keystone's provider representative simply apologized that Keystone led Kindred astray but said that there was nothing that could be done to rectify the error and get Kindred paid for the improperly denied October dates of service.

179. As such, Kindred remains severely underpaid for the medically necessary and specifically authorized care and treatment it provided in good faith to Insured 15, for which Keystone owes Kindred *$51,900.00*, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 16*

180. Prior to Insured 16's July 11, 2022, admission to Kindred Hospital Havertown, Kindred confirmed she was covered by an active Keystone First Medicaid policy, and that Kindred was in-network pursuant to the Agreement. Keystone further authorized Insured 16's admission and first two weeks of service through authorization number 92207017144.

181. In reliance upon Keystone's representations of coverage and authorization, Kindred admitted Insured 16 and provided her with medically necessary care and treatment until her discharge on August 14, 2022.

Case ID: 250200219

182.     Kindred billed its claims in the ordinary course, but Keystone denied payment for dates of service July 25 through August 14, 2022, for a lack of authorization. Kindred submitted a clinical appeal establishing that all dates of service were medically necessary and appropriate at the LTAC level of care, but Keystone errantly treated the appeal as a claim dispute rather than a clinical appeal and summarily upheld its claim decision, ostensibly without conducting a clinical review.

183.     Kindred appealed again, but then Keystone denied the appeal as purportedly untimely.

184.     Keystone's actions were wrong, as Kindred's initial appeal was unquestionably timely, and it was due to Keystone's own error that it was not reviewed properly. Furthermore, no appeal should have been necessary because Insured 16's care and treatment at Kindred during the entire admission was clearly medically necessary and appropriate at the LTAC level of care.

185.     In that regard, Insured 16 was admitted with express instructions from her physician at the prior short term acute care hospital, University of Pennsylvania Hospital, to complete a 42-day course of IV Vancomycin, with her last day anticipated to be August 14, 2022.

186.      IV Vancomycin is different than most other IV antibiotics because there is no fixed dose. The levels of IV Vancomycin in a patient's system must be closely monitored as high doses can damage the kidneys and insufficient amounts do not cure the bacterial infection being addressed.

187.     It is universally accepted as the standard of care to monitor the blood levels of Vancomycin via trough testing because the dose required to achieve appropriate blood levels can vary from day to day. The blood sampling required for monitoring of Vancomycin requires precise timing relative to dosing.

Case ID: 250200219

188.    This level of care is not reliably available at lower-level facilities where physicians do not round every day, where blood draws by outside laboratory facilities cannot be reliably timed relative to drug dosing, and where lab results for Vancomycin blood levels and renal function are not readily available to guide antibiotic dosing changes like they are at the LTAC level of care.

189.    Additionally, after a course of IV antibiotics is concluded, close monitoring by a patient's physicians is required to ensure no worsening in condition occurs off IV antibiotics. This is especially important with a medically complex person like Insured 16, who had a history of IV drug use and therefore was not appropriate for alternative medications or to be discharged home.

190.    Furthermore, proper antibiotic stewardship discourages physicians from administering antibiotics too frequently to mitigate against the risk of emerging bacterial resistance and the risk of adverse patient reactions. This fact makes close clinical and laboratory monitoring and daily physician judgment that much more important, and renders Keystone's decision to cut off coverage after only two weeks, when the average LTAC admission exceeds 25 days and at a time when IV Vancomycin was still being administered, contrary to the weight of clinical evidence.

191.    Indeed, Keystone authorized this admission to Kindred for the purpose of the administration of IV Vancomycin. For it to cut off coverage before the course of IV antibiotics was completed makes no sense.

192.    Keystone is thus obligated under the Agreement to reimburse Kindred at the contract rate for all dates of service between July 25 and August 14, 2022, for which it owes Kindred an additional *$26,000.00*, along with interest as allowed under Pennsylvania law.

Case ID: 250200219

## _Statement of Facts concerning Insured 17_

193.    Prior to Insured 17's February 4, 2022, admission to Kindred Hospital Philadelphia, Kindred confirmed with Keystone that she was covered by an active Keystone First Community HealthChoices Medicaid policy, and that Kindred was in-network through the Agreement.

194.    Kindred further sought and obtained authorization to admit Insured 17 under authorization number 92201076030.

195.    In reliance upon Keystone's representations of coverage and authorization, Kindred admitted Insured 17 and treated her until she was discharged on March 22, 2022.

196.    During the admission, Kindred continued to send Keystone regular clinical updates and Keystone continued to authorize coverage for Kindred's care and treatment until March 11, 2022, when Keystone purported to deny authorization due to an alleged lack of medical necessity.

197.    Kindred initiated the peer-to-peer review process with Keystone following the authorization denial, pursuant to which Keystone's medical director later communicated that the authorization denial had been overturned, and authorization was approved through March 24, 2022 (which is after Insured 17 was discharged).

198.    In an exercise of caution and diligence, while the peer-to-peer was pending, Kindred also appealed Keystone's errant authorization denial. Strangely, despite the peer-to-peer decision, Keystone denied Kindred's appeal and purported to uphold the authorization denial.

199.    Kindred submitted its claims in the ordinary course, expecting $86,400.00 in reimbursement for its authorized care and treatment of Insured 17, but Keystone paid only $59,600.00. The ostensible basis for Keystone's underpayment was that 11 dates of service were not authorized, in ignorance of its decision on the peer-to-peer review.

Case ID: 250200219

200. Thus, Kindred, through third-party Praxis, appealed again, but for more than a year Keystone said it could not locate the appeal before finally telling Kindred the appeal was supposedly denied as untimely even though no written decision was ever provided, and the appeal was unquestionably submitted within timely filing windows in any event.

201. Keystone's decisions were wrong. First, it correctly overturned its errant authorization denial after the peer-to-peer review and should pay Kindred for the denied dates of service for that reason alone. Absent that, however, as demonstrated in Kindred's clinical appeals, Insured 17's care and treatment was medically necessary and appropriate at the LTAC level of care for her entire admission.

202. Keystone owes Kindred an additional *$26,800.00* for the authorized and medically necessary care and treatment provided to Insured 17 between March 12 and 22, 2022, plus interest as allowed under Pennsylvania law.

### *Statement of Facts concerning Insured 18*

203. Prior to Insured 18's November 3, 2021, admission to Kindred Hospital Havertown, Kindred confirmed with Keystone that he was covered by an active Keystone First Medicaid policy, and that Kindred was in-network pursuant to the Agreement.

204. Keystone further authorized Insured 18's admission and first seven dates of service under authorization number 92110076346. In reliance upon Keystone's representations of coverage and authorization, Kindred admitted Insured 18 and began providing him with care and treatment.

205. Kindred submitted regular clinical updates to Keystone and Keystone continued to authorize Insured 18's care and treatment at Kindred through to his discharge on November 23, 2021.

Case ID: 250200219

206. Kindred billed for its services in the ordinary course, expecting reimbursement in the amount of $36,000.00 for the specifically authorized care and treatment provided to Insured 18.

207. For reasons that remain unclear, however, Keystone paid only $2,400.00 and requested medical records from Kindred despite the fact that all dates of service had been authorized and therefore there was no conceivable reason for Keystone to need such records.

208. Nevertheless, in an effort to get paid, Kindred provided the requested medical records and Keystone confirmed receipt of same.

209. Kindred followed up regularly for the next eight months, pursuant to which Kindred learned that Keystone was bizarrely treating the medical records as an appeal and continued to insist that they were still in review without rendering a decision or paying Kindred.

210. Thus, Kindred sought the assistance of Keystone's provider representative, who advised Kindred to bill a 117 claim and include the medical records, which Kindred did, only for the same representative to later say that in fact, Kindred needed to submit an appeal rather than a 117 claim, even though Keystone had already told Kindred it was treating the medical records that were sent as an appeal.

211. Keystone's "review" of Kindred's medical records went on for nearly two years, with countless follow-up from Kindred and internal "escalations" within Keystone, during which Keystone recouped the $2,400.00 payment that had been made, again without a valid explanation.

212. As a result, Kindred remains completely unpaid for the specifically authorized and medically necessary care it provided to Insured 18, for which Keystone owes Kindred *$36,000.00*, plus interest as allowed under Pennsylvania law.

Case ID: 250200219

## COUNT I – BREACH OF WRITTEN CONTRACT

213.    Kindred repeats and realleges the allegations contained in paragraphs 1 through 212, inclusive, and incorporates the same as though set forth in full.

214.    Kindred and Keystone entered into the Agreement, pursuant to which Kindred agreed to provide care and treatment to the Insureds in exchange for payment at a negotiated rate.

215.    Kindred performed all conditions, covenants, and promises on its part to be performed under the Agreement, except those that were excused by Keystone's conduct as detailed herein or were otherwise futile. In that regard, Kindred provided Keystone's Insureds with the necessary care and treatment they required.

216.    Keystone has breached the Agreement by, *inter alia*, failing to pay for the necessary care and treatment provided by Kindred to the Insureds at all or at the appropriate rate, failing to authorize continued care and treatment for the Insureds even when that care met criteria for continued LTAC care or was otherwise medically necessary, exercising its discretion on medical necessity determinations in erroneous, arbitrary, and capricious manners, subjecting Kindred's claims to unauthorized and unconsented charge-stripping, concocting specious reasons to deny payment for authorized care, failing to pay Kindred even when no safe discharge option existed and Kindred cooperated with Keystone in discharge planning efforts, and taking steps to avoid payment to benefit itself at the expense of Kindred.

217.    As a direct and proximate result of the foregoing breaches, Kindred has been damaged in an amount exceeding $1,393,006.88.

Case ID: 250200219

## COUNT II – PROMISSORY ESTOPPEL (in the alternative to Counts I and III)

218.     Except to the extent inconsistent with the following allegations, Kindred repeats and realleges the allegations contained in paragraphs 1 through 212, inclusive, and incorporates the same as though set forth in full.

219.     Prior to and in conjunction with the Insureds' admissions into Kindred, Keystone verified to Kindred that each of the individuals had insurance coverage and authorized their admissions.

220.     Following the Insureds' admissions into Kindred, Keystone further authorized continued dates of service for Kindred's care of the Insureds.

221.     In making those representations, Keystone did so with the knowledge that Kindred would reasonably be induced to rely on them, in that Kindred would admit the Insureds into its hospitals and provide the Insureds with continuing care and treatment until their discharge.

222.     Kindred, in reasonable reliance on Keystone's representations, admitted the Insureds and provided the Insureds with medically necessary care and treatment in good faith. Keystone's representations and promises, however, were not fulfilled. Instead, with respect to certain Insureds, after they were admitted, actively received medically necessary care, and either passed away while impatient or were discharged or transferred to another facility, Keystone refused to fully pay Kindred for the medically necessary and specifically authorized treatment of the Insureds.

223.     With respect to other Insureds, after they were admitted, actively receiving medically necessary care, and not ready to be discharged or transferred to a lower or other level of care, Keystone advised Kindred that it would not authorize or pay for future treatment of the Insureds.

Case ID: 250200219

224.    As a direct and proximate result of Keystone's misrepresentations, Kindred has suffered damages in an amount exceeding $1,393,006.88, insofar as, among other things, Kindred provided medically necessary care and services to the Insureds for which it has not been compensated, has been deprived of interest income on the amounts not paid during the period of non-payment, and has lost opportunity costs associated with its treatment of the Insureds rather than other patients.

### COUNT III – UNJUST ENRICHMENT (in the alternative to Counts I and II)

225.    Except to the extent inconsistent with the following allegations, Kindred repeats and realleges the allegations contained in paragraphs 1 through 212, inclusive, and incorporates the same as though set forth in full.

226.    Kindred provided care and treatment to the Insureds, under circumstances pursuant to which Keystone reasonably should have known that Kindred would expect to be compensated.

227.    Keystone received monies from the government to pay for the care and treatment provided to its enrollees, including the Insureds. These funds were intended to pay for the medical care Keystone's Insureds required and received. Yet Keystone failed to pay Kindred with these funds for the medical care and treatment Kindred provided to the Insureds in good faith.

228.    Consequently, Keystone has been unjustly enriched through the receipt of such reimbursements at the expense of Kindred and should be required by the Court to disgorge its profits earned in connection therewith.  Kindred is entitled to payment for the value of the services it provided to the Insureds for which Keystone has wrongfully withheld payment.

Case ID: 250200219

## **PRAYER FOR RELIEF**

WHEREFORE, Kindred requests judgment against Keystone as follows:

A.  For an award of damages in an amount to be proved at trial;

B.  For disgorgement of profits Keystone earned on the wrongfully withheld amounts;

C.  For pre-judgment and post-judgment interest at the maximum rate permitted by law;

D.  For Kindred's costs, expenses, and attorneys' fees associated with prosecution of this action to the extent permitted by law;

E.  For trial by jury; and

F.  For all other relief to which Kindred may be entitled.


Dated: March 14, 2025                                    Respectfully submitted,

*/s/ Benjamin J. Eichel*
Benjamin J. Eichel
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone:      610-822-0204
Fax No.:        610-822-0206
Email: beichel@bonizack.com

William H. Mazur (*pro hac vice* forthcoming)
FULTZ MADDOX DICKENS PLC
101 South Fifth Street, 27th Floor
Louisville, Kentucky 40202
Telephone:  502-588-2000
Fax No.:      502-588-2020
Email: wmazur@fmdlegal.com

*Attorneys for Plaintiff Kindred Hospitals East, LLC d/b/a Kindred Hospital – Philadelphia and Kindred Hospital - Havertown*

41

Case ID: 250200219

## **VERIFICATION**

I, Jason Perry, state that I am the Business Office Supervisor for the Centralized Business Office of ScionHealth, formerly Kindred Healthcare, that I am authorized to make this Verification on behalf of Kindred, that I have read the foregoing Amended Complaint and Jury Demand, and that the factual averments stated therein are true and correct to the best of my knowledge, information and belief.

I understand that the statements made herein are made subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

Dated: <u>March 3</u> , 2025

*Jason Perry*
_____
Jason Perry

Case ID: 250200219

# Exhibit 1

Case ID: 250200219

# KEYSTONE FAMILY HEALTH PLAN

# HOSPITAL  SERVICES  AGREEMENT

## KINDRED HOSPITALS
## EAST LLC

Case ID: 250200219

# TABLE OF CONTENTS

1.  Definitions.................................................................................................................................1-3

2.  Obligations of Hospital........................................................................................................3-4

3.  Obligations of KFHP ............................................................................................................5

4.  Confidentiality.....................................................................................................................6

5.  Quality Management/Utilization Management ....................................................................6

6.  Liability Insurance/ Indemnification/ Adverse Actions ....................................................6-7

7.  Terms of Agreement............................................................................................................7

8.  Termination.......................................................................................................................7-8

9.  Regulatory Provisions.......................................................................................................8-13

10. Cooperation.........................................................................................................................13

11. General terms...................................................................................................................13-14

12. Signature Page ....................................................................................................................15

13. Appendix A..........................................................................................................................16

14. Schedule A-1.......................................................................................................................

Case ID: 250200219

# KEYSTONE FAMILY HEALTH PLAN
## HOSPITAL SERVICES AGREEMENT

This Hospital Services Agreement (the "Agreement") dated as of the Effective Date set forth on the signature page hereto, by and between Keystone Family Health Plan ("KFHP"), a general partnership organized under the laws of the Commonwealth of Pennsylvania, for the Keystone First product and KINDRED HOSPITALS EAST LLC DBA Kindred Hospital Philadelphia and Kindred Hospital Philadelphia Havertown ("Hospital") identified on the signature page.

WHEREAS, KFHP is an Integrated Delivery System ("IDS") and has entered into, and may in the future enter into, an Integrated Delivery System Agreement (each, an "IDS Agreement") with Vista Health Plan, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania, or with other licensed health maintenance organizations to which KFHP is an IDS (collectively, "HMO"), whereby KFHP has agreed to provide or arrange for the provision of specified health services, including hospital, physician and other ancillary health services and share risk and financial liability with HMO for providing such services to Members.

WHEREAS, KFHP has contracted with hospitals, selected primary care providers, specialist providers and ancillary providers for the purpose of providing services pursuant to the IDS Agreement.

WHEREAS, KFHP desires to have Hospital provide certain Hospital Services that KFHP is obligated to provide, and Hospital desires to provide such services.

WHEREAS, for purposes of this Agreement, Members are defined to include individuals eligible for Medical Assistance who are enrolled in the product operated by KFHP; and

NOW, THEREFORE, in consideration of the mutual promises made herein, it is mutually agreed by and between KFHP and Hospital that the Agreement will be as follows:

---

## 1. DEFINITIONS

As used in this Agreement, each of the following terms shall have the meaning specified herein, unless the context clearly requires otherwise.

1.1. **AFFILIATES.** An Affiliate is any corporation or other organization serving Medical Assistance recipients that is identified as an Affiliate in a written notice to Hospital and is owned or Controlled By, either directly or through parent or subsidiary corporations, or Under Common Control With, KFHP. KFHP shall give Hospital thirty (30) days advance written notice of the addition of Affiliates added under this provision. Unless otherwise specified in this Agreement, or any other attachment hereto, references to "KFHP" shall include the Affiliates referenced herein.

1.2. **CLEAN CLAIM.** A claim for payment for a health care service, which has been received by KFHP and has no defect or impropriety. A defect or impropriety shall include a lack of required substantiating documentation or a particular circumstance requiring special treatment, which prevents timely payment from being made on the claim. The term shall not include a claim from a health care provider who is under investigation for fraud or abuse regarding that claim.

1.3. **CONTROL, CONTROLLING, CONTROLLED BY, or UNDER COMMON CONTROL WITH.** The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services or otherwise, unless the power is the result of an official position with or corporate office held by the person. Control shall be presumed to exist if any person, directly or indirectly, owns, controls, holds with the power to vote or holds proxies representing ten per centum (10%) or more of the voting securities of any other person.

Case ID: 250200219

1.4.    **COVERED SERVICES.** Services and supplies furnished by Hospital for which a Member has coverage pursuant to the DHS Contract.

1.5.    **DEPARTMENT.** The Pennsylvania Department of Human Services or its successor agency.

1.6.    **DHS CONTRACT.** The applicable contract or contracts with the Department, as in effect from time to time, pursuant to which KFHP coordinates health care services and supplies for Medical Assistance recipients enrolled with KFHP.

1.7.    **EFFECTIVE DATE.** The later of (i) the effective date on the signature page of this Agreement or (ii) the effective date of the DHS Contract, provided that Hospital has been successfully credentialed by KFHP and that all required regulatory approvals have been obtained by KFHP.

1.8.    **EMERGENCY SERVICES.** Health care services provided to a Member after the sudden onset of a medical condition that manifests itself by acute symptoms of sufficient severity or severe pain, such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in:

    (a)  Placing the health of the Member or, with respect to a pregnant woman, the health of the Member or her unborn child, in serious jeopardy;

    (b)  Serious impairment to bodily functions; or

    (c)  Serious dysfunction of any bodily organ or part.

Emergency transportation and related emergency service provided by a licensed ambulance service shall constitute an emergency service.

1.9.    **GRIEVANCE PROCEDURES.** The procedures established by KFHP for the prompt resolution of Member problems, complaints and grievances, as more fully described in the Provider Manual.

1.10.   **HEALTH CARE-ASSOCIATED INFECTION.** A localized or systemic condition that results from an adverse reaction to the presence of an infectious agent or its toxins that: (1) occurs in a patient in a health care setting; and (2) was not present or incubating at the time of admission, unless the infection was related to a previous admission to the same setting; and (3) if occurring in a hospital setting, meets the criteria for a specific infection site as defined by the Centers for Disease Control and Prevention and its National Healthcare Safety Network.

1.11.   **HOSPITAL SERVICES.** Those health care services that Hospital furnishes to patients who present themselves to Hospital for treatment as inpatients, outpatients or emergency patients.

1.12.   **MEDICALLY NECESSARY.** A service is medically necessary if it is compensable under the Medical Assistance program and meets any one of the following standards:

    (a)  The service or benefit will, or is reasonably expected to, prevent the onset of an illness, condition or disability;

    (b)  The service or benefit will, or is reasonably expected to, reduce or ameliorate the physical, mental or developmental effects of an illness, condition, injury or disability; or

    (c)  The service or benefit will assist the Member to achieve or maintain maximum functional capacity in performing daily activities, taking into account both the functional capacity of the Member and those functional capacities that are appropriate for Members of the same age.

KFHP shall base its determination on medical information provided to it by the Member, the Member's family/caretaker and/or primary care physician as well as any other providers, programs and agencies that have evaluated the Member. Qualified and trained personnel will make medical necessity determinations.

Case ID: 250200219

1.13. **MEMBER.** An individual that is eligible for Medical Assistance and who has enrolled in KFHP.

1.14. **PARTICIPATING HOSPITAL.** A duly licensed hospital which has entered into an agreement with KFHP to provide Hospital Services to Members.

1.15. **PARTICIPATING PROVIDER.** A physician duly licensed to practice medicine in the Commonwealth of Pennsylvania, and is a member of the medical staff of a Participating Hospital or has a collaboration agreement with a Participating *Provider* who is able to admit to a Participating Hospital, or a licensed, appropriately supervised allied health professional, who has entered into, or who is recognized by KFHP as a member of a group which has entered into, an agreement with KFHP to provide medical services to Members.

1.16. **PLAN BENEFITS.** Covered Services, which shall be provided to Members by Hospital, as described more specifically in Appendix A.

1.17. **PROVIDER MANUAL.** The manual of standards, policies, procedures and corrective actions to be provided to Hospital by KFHP together with amendments or modifications KFHP may adopt from time to time. The Provider Manual is herein incorporated by reference and made part of this Agreement. The Provider Manual may be amended or modified by KFHP in accordance with Section 3.5 herein below.

1.18. **QUALITY MANAGEMENT PROGRAM.** An ongoing review process and plan which functions to define, monitor, review, and recommend corrective action for managing and improving the quality of health care services rendered to Members.

1.19. **UTILIZATION MANAGEMENT PROGRAM.** A process of review of the appropriateness and medical necessity of Covered Services provided to Members.

## 2. OBLIGATIONS OF HOSPITAL

2.1. Hospital shall provide to Members the Plan Benefits described in Appendix A hereto; provided, however, that Hospital shall only be obligated to provide Plan Benefits to a Member upon an admission or referral of said Member to Hospital by a Participating Provider and otherwise in accordance with KFHP admission policies as described in the Provider Manual, other than Emergency Services, which will be provided as needed. Hospital shall provide such services in the same manner and with the same availability as services provided to other patients without regard to reimbursement and shall further provide these services in the most cost effective setting in accordance with appropriate quality of care and performance standards which are professionally recognized as industry standards and/or otherwise adopted, accepted or established by KFHP. Hospital shall comply with all *State and* federal laws and regulations applicable to Hospital and the services performed by Hospital under this Agreement.

2.2. Hospital's charges for Plan Benefits to Members shall be the same as its charges to all patients for the same services. During the term of this Agreement, Hospital shall maintain in its accounting records a system of recording gross charges by patient and payor. Hospital shall submit its then current schedule of charges by revenue code and procedure code to KFHP upon thirty (30) days prior written request.

2.3. Hospital shall ensure that any employed physician, or any physician practice which Hospital or Hospital affiliate owns or controls that has admitting privileges at or provides services at the Hospital, shall accept all Members. Hospital shall notify KFHP within sixty (60) days of the acquisition of any physician practice by Hospital or a Hospital affiliate if such practice has admitting privileges at or provides services at the Hospital. Hospital acknowledges that if any acquired physician practice is participating with KFHP at the time of such acquisition, appropriate addenda shall be executed by Hospital or Hospital affiliate, physician/physician practice and KFHP, as may be applicable. If the physician practice or new employed physician is not participating with KFHP at the time of such acquisition, upon request by KFHP, Hospital shall ensure that such physician promptly apply for KFHP participation, comply with KFHP credentialing requirements and execute an appropriate KFHP provider agreement. KFHP's credentialing process must be successfully completed prior to providing services to Members. In the event Hospital or Hospital affiliate must limit the growth of any such acquired physician practice due to capacity constraints, Hospital or the Hospital affiliate shall cause the practice to make itself available to Members on the same basis as it is to any other patients.

Case ID: 250200219

2.4. Hospital shall not bill or collect from any Member any amount or charges for any Covered Services provided hereunder, except for authorized co-payments, co-insurance, and/or deductibles. Hospital shall not deny Covered Services to a Member in the event that a Member is unable to pay any authorized co-payment amounts.

2.5. Hospital may directly bill Members for non-Covered Services provided that, prior to rendering said services, Hospital must inform Member in writing that the services are not covered by KFHP and if Member elects to receive said services, Member will be financially responsible for the same. As required by law, under no circumstances, including KFHP's failure to pay for Plan Benefits, termination of this Agreement, or the insolvency of KFHP, shall the Hospital bill KFHP Members for Plan Benefits.

2.6. Hospital shall provide KFHP with complete and accurate statements of all Plan Benefits provided to Members in conformance with KFHP billing procedures, including without limitation, use of complete applicable diagnosis, procedure and revenue codes. KFHP will not be liable for any bills relating to services that are submitted the later of: (a) after one-hundred-and-eighty days (180) from the date the services were provided or the Member was discharged, or (b) after sixty (60) days of the date of the Explanation of Benefits from another payor when services are first billed by Hospital to another payor. Any appeal or request for adjustment of a payment by Hospital must be made in accordance with applicable provisions of the Provider Manual and, in any case, must be received by KFHP within sixty (60) days of the original payment or denial. Hospital may not bring legal action on claims which have not been appealed through the appeal mechanisms described herein for which such appeal mechanisms have not been exhausted.

2.7. Hospital understands and agrees that any payments KFHP makes directly or indirectly to Hospital under this Agreement shall not be made as an inducement to reduce, limit or delay Medically Necessary services to any Member.

2.8. Hospital will make best efforts to refer KFHP's Members to KFHP Participating Hospitals whenever Hospital is unable to provide Medically Necessary services and when consistent with sound medical judgment and accepted standards of care.

2.9. Hospital agrees to cooperate with KFHP in maintaining and providing to KFHP, or the Department, at no cost to them, medical records, financial data, administrative materials and other records as may be reasonably requested by KFHP and/or the Department. Hospital agrees to provide one free set of medical records. The costs for additional requests shall be borne by the requestor. The costs for additional requests shall be borne by the requestor but will not exceed $20.00 per request or $.25 per page. Notwithstanding the foregoing, any requests for records by any state or federal agency shall be provided at no cost to KFHP or the requesting agency.

2.10. Hospital will assist KFHP in providing orientation services to Hospital staff, to the extent KFHP may reasonably request.

2.11. Hospital will cooperate with KFHP in coordinating benefits with other payors in accordance with coordination of benefits claim processing rules and requirements outlined in the Provider Manual. Hospital will make a reasonable attempt to determine whether any other payor has primary responsibility for the payment of a claim for services that Hospital rendered to a Member and bill that payor before billing KFHP. KFHP retains the right to recover payments made to Hospital if KFHP determines that another payor is primarily responsible for all or a portion of the claim.KFHP agrees to notify Hospital at least 30 days before an offset can occur.

2.12. Hospital authorizes KFHP to include Hospital's name, address, and other similarly identifying and/or descriptive information in KFHP's hospital directory, which may be included in various marketing materials and/or initiatives. Hospital agrees to afford KFHP the same opportunity to display brochures, signs or advertisements in Hospital's facilities as Hospital affords any other insurance company or other third party payor. Hospital may, with the prior written consent of KFHP, engage in its own marketing activities designed to promote Hospital as a Participating Hospital with KFHP.

Case ID: 250200219

2.13. Hospital shall use best efforts to use KFHP's electronic utilization management and claims interfaces to improve the efficiency of utilization management and claims payment processes.

## 3. OBLIGATIONS OF KFHP

3.1. KFHP shall pay Hospital for Plan Benefits provided to Members pursuant to the terms of this Agreement. KFHP shall have the right to offset claims payments to Hospital by any amount owed by Hospital to KFHP KFHP will provide thirty (30) days prior written notice to Hospital before using an offset as a means to recover any amount owed to KFHP and will not implement the offset if, within thirty (30) days of the notice, Hospital refunds the overpayment. Nothing contained herein shall be deemed to impair Hospital's right to appeal KFHP's demand for recovery but initiation of the appeal shall not affect KFHP's right to recover any monies due. Hospital shall not be entitled to reimbursement if the Member was not eligible at the time services were rendered

3.2. KFHP shall pay Hospital fees for Plan Benefits provided to Members by Hospital upon receipt of a statement thereof, as defined in 2.6 and in accordance with 2.11 and the Hospital Service Payment Schedule set forth in Appendix A but, in no event, will KFHP's payment exceed submitted charges. No additional charges will be made by Hospital to KFHP for Plan Benefits provided hereunder, and Hospital recognizes and accepts the fees set forth in Appendix A as payment in full.

3.3. KFHP will establish payment policies for inpatient and outpatient services including, but not limited to, policies with respect to pre-admission testing, services included in inpatient rates and services included in outpatient rates. KFHP will provide at least thirty (30) days prior written notice of any modifications to such payment policies. KFHP may, based on changes in clinical practice and modifications to standard coding systems, add and/or delete outpatient fee schedule procedures and recategorize outpatient surgery fee schedule procedures, upon thirty (30) days prior written notice to Hospital.

3.4. KFHP shall pay all Clean Claims for Covered Services in accordance with applicable laws and regulations, including 40 P.S. §991.2166 and 31 Pa. Code §154.18, and DHS Contract requirements.

3.5. KFHP will provide Hospital with a Provider Manual and with periodic updates to the Provider Manual. Provider Manual updates will become effective thirty (30) days from the date of notification, unless a longer timeframe is otherwise specified in writing by KFHP. Notwithstanding the foregoing, updates required because of legislative, regulatory or governmental agency requirements do not require the consent of Hospital or KFHP and shall be effective immediately on the effective date thereof. In the event that Hospital believes such update results in a "Material Adverse Impact" on Hospital in connection with the performance of this Agreement such that the basis for the financial bargain of this Agreement is undermined Hospital shall so notify KFHP. "Material Adverse Impact" shall mean that such modification will likely result in an aggregate annualized negative impact to Hospital in an amount equal to or greater than 2% for the services affected by the change,(You can change this to a dollar figure or whatever works. I just pulled this from another agreement.) either in the form of reduced reimbursement or increased costs to administer the change (including, without limitation, a combination of reduced reimbursement and increased costs), Hospital shall provide KFHP with the projected financial impact of the Material Adverse Impact and the Parties shall meet in good faith to achieve revenue neutrality resulting from the change. The Parties shall appoint executive representatives with authority to bind the respective Parties to resolution of the objection and such representatives will meet and confer within thirty (30) days of the date of such objection to resolve the objection in a manner designed to achieve revenue neutrality. If the Parties are unable to resolve the objection within such 30-day period, the party requesting such renegotiation may terminate this Agreement upon ninety (90) days' prior written notice to the other party. Any objection, attempts at negotiation or notice of termination shall not affect the effective date of the policy's implementation.

Case ID: 250200219

## 4. CONFIDENTIALITY

KFHP and Hospital shall each comply with all applicable state and federal laws respecting the confidentiality of the medical, personal or business affairs of Members acquired in the course of providing Plan Benefits. Each party shall maintain as confidential and shall not disclose to third parties financial, operating, proprietary or business information relating to the other party which is not otherwise public information. The payment rates in this Agreement are confidential and proprietary. However, nothing herein shall prohibit either party from making any disclosure or transmission of information to the extent that such disclosure or transmission is required by the Department or is necessary or appropriate to enable the disclosing party to perform its obligations under this Agreement or is required by law or legal process. Should disclosure be required by law or legal process, the disclosing party shall immediately notify the other party of the disclosure

## 5. QUALITY MANAGEMENT/UTILIZATION MANAGEMENT

5.1. The Utilization Management and Quality Management Programs are described in the Provider Manual.

5.2. KFHP Quality Management Programs consist of review of credentials and performance of applying hospitals and Participating Hospitals to determine whether the Hospital meets KFHP standards for quality, availability, accessibility and cooperation.

5.3. KFHP Utilization Management Programs include requirements for pre-authorization of certain services rendered in physician's offices and in inpatient, outpatient and ancillary Hospital settings. Utilization Management Programs include concurrent, retrospective and prospective review of certain services and procedures to assure that care is delivered in the most appropriate setting and is Medically Necessary. Certain Covered Services may require prior approval from KFHP. The Covered Services subject to prior approval are more fully described in the Provider Manual and other notices. KFHP is obligated to pay for and Hospital is entitled to reimbursement for only those services that are Medically Necessary. Where an admission, inpatient day or outpatient service is denied as not prior approved or Medically Necessary, the Hospital shall not charge either KFHP or the Member for any health care services rendered or furnished with respect to such admission, inpatient day or outpatient service. If Hospital disputes any such denial, the case in question shall be appealed through KFHP's provider appeal process, which process shall be the exclusive means of resolving such disputes.

5.4. Hospital will cooperate and abide by KFHP's Utilization Management and Quality Management Programs and Grievance Procedures. Hospital shall permit a representative of KFHP, or its designee, to review medical records concurrently as well as retrospectively. Hospital shall provide copies of such medical records, in either paper or electronic form, to KFHP or its designee upon request. Hospital agrees to provide one free set of medical records. The costs for additional requests shall be borne by the requestor but will not exceed $20.00 per request or $.25 per page.

## 6. LIABILITY INSURANCE/ INDEMNIFICATION/ ADVERSE ACTIONS

6.1. Hospital, at its sole expense, shall provide professional liability malpractice insurance coverage (including coverage for vicarious liability, if any, for the acts of employees, agents and representatives of Hospital) while Hospital is providing services for Members under the terms of this Agreement, as follows:

(a) Amounts and extent of such insurance coverage shall not be less than the amounts required by law or the DHS Contract.

(b) Hospital shall provide copies of face sheets of such coverage to KFHP, HMO or the Department upon request, and shall notify KFHP in advance of any change or cancellation of such coverage.

Case ID: 250200219

6.2. Hospital shall notify KFHP in writing, within five (5) days of receiving any written or oral notice of any adverse action, including, without limitation, any malpractice suit or arbitration action, or other action naming or otherwise involving Hospital, KFHP, or any other event, occurrence or situation which might materially interfere with, modify or alter performance of any of Hospital's duties or obligations under this Agreement. Hospital shall forward to KFHP any written complaint or grievance of a Member against Hospital within five (5) business days of receipt thereof. Hospital shall maintain a written record of any Member complaint and provide such record to KFHP promptly upon request. Hospital also shall notify KFHP promptly of any action against any applicable license, certification or participation under Title XIX or other applicable provision of the Social Security Act or other State law, State and/or DEA narcotic registration certificate, and of any material change in the ownership or business operations of Hospital. All notices required by this Section 6.2 shall be provided to the individuals set forth in Section 11.1 of this Agreement.

6.3. Each party (the "indemnifying party") agrees to indemnify the other party from and against any and all claims, costs and liabilities (including the fees and expenses of counsel) as a result of death, personal injury or malpractice arising in connection with the performance of any services by the indemnifying party in connection with this Agreement.

## 7. TERM OF AGREEMENT

7.1. The term of this Agreement shall commence on July 1, 2019 and continue until June 30, 2020 (the "Initial Term"). After the Initial Term, the Agreement shall automatically renew for one (1) year terms unless the Agreement is terminated pursuant to Sections 3.5 or 8 as set forth therein.

## 8. TERMINATION

8.1. Either party may terminate this Agreement without cause at the end of the Initial Term, or at any time after the Initial Term, by providing the other party with at least one hundred twenty (120) days prior written notice. The effective date of termination without cause will be on the first of the month following the expiration of the notice period. Either party may terminate this Agreement for cause due to a material breach by giving ninety (90) days prior written notice. The notice of termination for cause will not be effective if the breaching party cures the breach within the first sixty (60) days of the ninety (90) day notice period. In the event that the breaching party does not cure the breach within the sixty (60) day period, the effective date of termination will be the first of the month following the expiration of the ninety (90) day notice period.

8.2. In the event any change in law, regulation or the Pennsylvania Medical Assistance Program, including the Pennsylvania Health Choices Program, would have a material adverse impact on either KFHP or Hospital in connection with the performance of this Agreement (the "Mandated Changes") such that the basis for the financial bargain of this Agreement is undermined, then the affected party shall have the right to require the other, by written notice, to enter into negotiations regarding the affected or pertinent terms of this Agreement while still maintaining the original Agreement purposes. If renegotiated, such terms shall become effective no later than thirty (30) days after the Parties have reached agreement on the renegotiated terms. The Parties agree to make a good faith attempt to renegotiate the Agreement to the extent necessary to comply with any Mandated Changes. If, after good faith renegotiations, the Parties fail to reach an agreement satisfactory to both Parties within thirty (30) days of the request for renegotiation, the party requesting such renegotiation may terminate this Agreement upon ninety (90) days prior written notice to the other party.

8.3. KFHP shall have the right to terminate this Agreement immediately by written notice to Hospital upon the occurrence of any of the following events:

(a) The suspension or revocation of Hospital's license or other certification or authorization necessary for Hospital to provide Hospital Services; or

(b) The suspension, revocation or loss of the Hospital's JCAHO accreditation; or

(c) The suspension, revocation or loss of Hospital's Medicare Certification or ability to fully participate in the Pennsylvania Medical Assistance Program; or

Case ID: 250200219

(d)  Upon the loss or suspension of the required liability coverage set forth under Section 6 of this Agreement.

8.4.  This Agreement may be terminated at any time by mutual written consent of the parties.

8.5.  After the Initial Term of the Agreement, either party may terminate a Product which is described in this Agreement without cause upon one hundred and twenty (120) days prior written notice to the other party.  In the event a  specific Product is terminated, such termination shall not constitute termination of any other Product Provider has entered into pursuant to the Agreement.

## 9.  REGULATORY PROVISIONS:

9.1.  <u>Standards, Policies and Procedures.</u>  Hospital agrees to abide by the relevant standards, policies and procedures of KFHP, including, but not limited to administrative, credentialing, quality management, utilization management, and Grievance Procedures.  Compliance with Paragraph 9.1 shall include, but not be limited to, Hospital's adherence to the requirement that no Participating Provider affiliated with Hospital will render Covered Services to any Member unless and until said provider has been appropriately credentialed by KFHP.

9.2.  <u>Record Maintenance, Inspection, Reporting and Auditing.</u>

(a)  <u>Record Maintenance.</u>  Hospital shall maintain data reporting information, including encounter and utilization information, as well as any other records and reports necessary to ensure KFHP's compliance with the IDS Agreement, Department requirements, and any applicable state and federal laws and regulations.  Hospital shall preserve and maintain all records relating to services provided hereunder for the longer of seven (7) years from the termination of the Agreement or in accordance with applicable law; provided, however, that medical records shall be preserved and maintained in accordance with subsection 9.2(b) (1) herein.  Records other than medical records may be kept in an original paper state or preserved on micro-media or in an electronic format.

(b)  <u>Record Inspection and Auditing.</u>  Hospital shall provide, upon request, the following:

(1)  <u>Medical Records.</u>  Hospital shall make the medical records of Members available to KFHP and/or the Department upon request.  Hospital shall preserve and maintain medical records for the longer of five (5) years from the termination of the Agreement or in accordance with applicable law; provided, however that such records shall be maintained in paper form for a minimum of two (2) years from the date of service.

(2)  <u>Other Records.</u>  KFHP or its designee shall be entitled to audit, examine and inspect Hospital's books and records pertaining to Hospital's relationship with KFHP, at any time during normal business hours, upon reasonable notice.  Hospital agrees to provide KFHP or its designee with such medical, financial, and administrative information as may be necessary for KFHP to meet its respective contractual and regulatory obligations, Utilization and Quality Management Program standards, including NCQA standards, and other relevant accreditation standards which KFHP may require of Participating Hospitals.

(c)  <u>State and Federal Regulator Access.</u>  Except as may otherwise be prohibited by law, Hospital shall, at its own expense, provide state and federal agencies, including, but not limited to, the Department, and/or its independent external quality review contractor or other designated representatives, and the Commonwealth of Pennsylvania Department of Health and Insurance Department or their agents, with access to such records as they may reasonably request for purposes including, but not limited to, the evaluation of the quality, appropriateness, and timeliness of services provided to Members by KFHP under the IDS Agreement, investigation of Member complaints or grievances, and enforcement or other activities related to KFHP's compliance with 40 P.S. §991.2012 et seq. and the regulations issued thereunder and other applicable laws and regulations. Any such records shall only be accessible by employees or agents of state or federal agencies who have direct responsibilities for the activities described herein.

Case ID: 250200219

(d) <u>Survivability of Requirements.</u> The provisions of this section shall survive the termination of this Agreement and Hospital shall be required to comply with the terms and conditions of this section concerning any services performed during the term of the Agreement.

9.3. <u>Fraud and Abuse.</u>

(a) Hospital recognizes that payments made by KFHP pursuant to the Agreement are derived from federal and state funds, and acknowledges that it shall be held civilly and/or criminally liable to KFHP and/or the Department, in the event of non-performance, misrepresentation, fraud or abuse for services rendered to Members, including but not limited to, the submission of false claims/statements for payment by Hospital, its employees or agents.

(b) Hospital shall be required to comply with all policies and procedures, as developed by KFHP and/or the Department, for the detection and prevention of fraud and abuse. Such compliance may include, but not be limited to, referral of information of suspected or confirmed fraud or abuse to KFHP and/or immediate notification to the Department regarding such suspected or confirmed fraud and abuse. Hospital acknowledges receipt of notification from KFHP of the prohibition of and imposition of sanctions for the submission of false claims and statements.

9.4. <u>Third Party Liability.</u> Hospital shall cooperate with KFHP in the identification of other sources of payment available to Members, such as other health insurance, government programs, liability coverage, motor vehicle coverage or worker's compensation coverage, as applicable. Hospital shall further cooperate with the Department or its designee, in the determination of primary and secondary liability, and abide by KFHP's and the Department's coordination of benefits policies and procedures, as developed and amended from time to time. It is understood that Hospital shall be responsible for reporting all applicable third party resources to KFHP in a timely manner.

9.5. <u>Non-Discrimination.</u>

(a) Hospital shall comply with (i) Title VI of the Civil Rights Act of 1964 and the rules, regulations, and order thereunder; (ii) Executive Order 11246 of the President of the United States; (iii) the Rehabilitation Act of 1973 and the rules, regulations, and orders thereunder; (iv) the Americans With Disabilities Act of 1990 and the rules, regulations, and orders thereunder; and (v) any and all applicable laws, rules and regulations prohibiting discriminatory practices. Hospital shall be responsible for and agrees to indemnify and hold harmless the Department and the Commonwealth of Pennsylvania, and their agents, officers and employees, against all injuries, death, losses, damages, claims, suits, liabilities, actions, judgments, costs and expenses brought by any party against the Department or the Commonwealth as a result of Hospital's failure to comply with these non-discrimination provisions.

(b) Hospital shall not deny services to a Medical Assistance consumer during that consumer's fee-for-service eligibility window prior to the effective date of that consumer becoming enrolled in a Pennsylvania HealthChoices Managed Care Organization.

9.6. <u>IDS Provisions.</u>

(a) <u>Acknowledgements:</u>

(1) Hospital Acknowledges and agrees that nothing in this Agreement shall limit:

a. The authority of KFHP and/or HMO to ensure Hospital's participation and/or compliance with KFHP quality management, utilization management, Member grievance and other policies and procedures or limits, as amended from time to time and approved by HMO.

b. The authority of the relevant state and federal regulatory agencies, including, but not limited to the Department and the Commonwealth of Pennsylvania Department of Health, to: (1) monitor the effectiveness of KFHP or HMO's systems and procedures or the extent to which HMO adequately monitors those functions delegated to KFHP pursuant to the IDS Agreement, or (2) require HMO or KFHP to take prompt corrective action regarding quality of care or Member

Case ID: 250200219

complaints and grievances.

    c.   The authority of HMO to sanction and/or terminate a Participating Hospital, found to be providing inadequate or poor quality care or failing to comply with KFHP policies and procedures, as amended from time to time and approved by HMO. Hospital agrees to participate in and abide by decisions of KFHP's and/or HMO's quality assurance, utilization management and Member grievance systems.

  (2)  Hospital further acknowledges and agrees that:

    a.   If in the judgment of HMO, Hospital has failed to cooperate with KFHP in the provision of cost-effective, quality services to Members, or has failed to cooperate with and abide by the provisions of KFHP's quality management, utilization management or Member grievance systems, as amended from time to time and approved by HMO, or is found to be harming Members, HMO may terminate Hospital's participation with KFHP.

    b.   Any delegation by HMO to KFHP under the IDS Agreement for performance of quality management, utilization management, credentialing, provider relations and/or other medical management systems, shall be subject to HMO's oversight and monitoring; such delegation to be the subject of a separate agreement.

    c.   Upon the failure of KFHP to properly implement and administer such systems or to take prompt corrective action after identifying quality, Member satisfaction or other problems, HMO may terminate the IDS Agreement with KFHP and that, as a result of such termination, Hospital's participation in KFHP may also be terminated.

(b)  <u>Credentialing.</u>  Hospital must at all times adhere to and maintain the credentialing standards established by KFHP, as amended from time to time and approved by HMO, as well as any other standards or criteria required by the Department and/or the Commonwealth of Pennsylvania Department of Health. HMO retains the sole authority to accept, reject or terminate Hospital in the event that Hospital fails to meet such standards on a continuing basis.

(c)  <u>Hold Harmless.</u>  Hospital agrees that in no event, including, but not limited to, nonpayment by KFHP or HMO, the insolvency of KFHP or HMO, or breach of this Agreement, shall Hospital bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons other than KFHP acting on their behalf for services listed in this Agreement. This provision shall not prohibit collection of supplemental charges or co-payments on KFHP's behalf made in accordance with terms of an enrollment agreement between KFHP and Members.

Hospital further agrees that:

  (1)  this hold harmless provision shall survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of Members and that

  (2)  this hold harmless provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Hospital and Members or persons acting on their behalf.

(d)  <u>Records.</u>  Hospital agrees to cooperate with and provide KFHP, HMO, the Pennsylvania Department of Health, and any external quality review organization approved by the Department of Health, with access to Member medical records for the purposes of quality assessment and quality improvement or investigation of Member complaints or grievances. Hospital further agrees to provide such information, including but not limited to encounter, utilization, referral and other data, and KFHP and/or HMO may require to be submitted to it for compliance with its respective data reporting requirements or as required by the Department of Health.

9.7.    <u>Confidentiality.</u>  Hospital expressly understands and agrees that a confidential relationship has been established between KFHP and Hospital under the Agreement and that, as a result thereof, Hospital will receive confidential information concerning Members and/or other Medical Assistance recipients. Therefore,

Case ID: 250200219

Hospital agrees to comply with the requirements of 42 C.F.R. Section 431.300 et seq. , 40 P.S. §991.2131,and any other applicable laws, regarding the safeguarding of information on Medical Assistance recipients and/or Members.

9.8.    Continued Treatment Obligation.  Notwithstanding any other provision of the Agreement, in the event of either party's termination of the Agreement, termination of the IDS Agreement, insolvency of either KFHP, or other cessation of KFHP's operations, Hospital shall continue to provide Covered Services to Members and be paid for (at the rates stated in this Agreement) (i) until a Member's course of treatment by Hospital is completed, (ii) through the period for which premium has been paid by the Department, (iii) until the Member ceases to be covered, (iv) until the Member's care has been transferred to another Hospital consistent with the Member's medical needs, or (v) until the date of a Member's discharge from an inpatient facility, whichever is sooner.

9.9.    Claims Submission and Encounter Data Reports.  Hospital must submit claims for services rendered within one-hundred eighty (180) days of service date or as otherwise required in the Provider Manual.  Hospital shall deliver all information submitted to KFHP pursuant to this Agreement, including encounter data,  in a format which will allow KFHP to transmit required data to the Department electronically, in a format identical to or consistent with the format used or otherwise required by KFHP or the Department.  Hospital shall submit this information to KFHP within one hundred eighty (180) days after the date of service, regardless of whether reimbursement is made by KFHP either directly or indirectly through capitation.

9.10.    Department Hold Harmless.  Hospital agrees to indemnify and hold harmless the Department of Public Welfare, the Commonwealth of Pennsylvania, its directors, officers employees and agents and Members from any claim, suit, cost, injuries, death, loss, liability, judgment, or expense, including, but not limited to, costs of defense incurred by the Department, the Commonwealth, its directors, officers, employees and agents as a result of intentional conduct, negligent actions or omission or breach of this Agreement by Hospital or Hospital employees, agents, officers, or contractors.

9.11.    Hospital Protections.

(a)    KFHP shall not exclude or terminate Hospital from KFHP's hospital network or fail to renew Hospital's network participation agreement because: (i) the Hospital advocated on behalf of a Member, including in the context of a utilization management appeal or another dispute with KFHP over Medically Necessary and appropriate medical care, provided that such advocacy is consistent with the degree of learning and skill ordinarily possessed by a reputable health care provider practicing in accordance with the applicable legal standard of care, or (ii) the Hospital protested a KFHP decision, policy or practice that Hospital believes interferes with its ability to provide Medically Necessary and appropriate health care.  Further, KFHP shall not exclude or terminate Hospital from KFHP's provider network or  fail to renew Hospital's by 40 P.S. §991.2113, §991.2121, and §991.2171.

(b)    Nothing in this Agreement shall be construed to prohibit, restrict or impede Hospital's ability to freely and openly discuss with Members all available treatment options and the risks, benefits and consequences of treatment or non-treatment, regardless of whether the services may be considered Covered Services in accordance with this Agreement.  Further, nothing in this Agreement shall be construed to prohibit, restrict or impede Hospital from discussing Medically Necessary care and advising or advocating appropriate medical care with or on behalf of a Member, including:  information regarding the nature of treatment options, risks of treatment, alternative treatments or the availability of alternative therapies, consultation or tests that may be self-administered.

(c)    No Hospital shall be excluded or terminated from participation with KFHP due to the fact that the Hospital has a patient population that includes a substantial number of patients with expensive medical conditions.

(d)    Hospital shall not be excluded from participation, nor shall this Agreement be terminated, because Hospital objects to the provision of or refuses to provide a healthcare service on moral or religious grounds.

Case ID: 250200219

9.12.  Unique Identifier. Hospital shall obtain a unique identifier in accordance with the system established under Section 1173(b) of the Social Security Act and agrees to submit such identifier number to KFHP.

9.13.  Physician Incentives. Hospital shall disclose annually any Provider Incentive Plan (PIP) or risk arrangements Hospital may have with physicians, either with physicians affiliated with Hospital or other physicians not affiliated with Hospital, even if there is no substantial financial risk between KFHP and the physicians. The term "substantial financial risk" means a financial risk set at greater than twenty-five percent (25%) of potential payments for Covered Services, regardless of the frequency of assessment (i.e., collection) or distribution of payments. The term "potential payments" means simply the maximum anticipated total payments that the physician or physician group could receive if the use or cost of referral services were significantly low.

9.14.  Federal Regulator Access.

Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, Hospital shall make available, upon written request, to the Secretary of Health and Human Services, the Comptroller General or any other duly authorized representatives, this Agreement, and the books, documents and records of Hospital necessary to certify the nature and extent of the cost of services of Hospital.

If Hospital carries out any of its duties hereunder with a value or cost of ten thousand ($10,000) dollars or more over a twelve (12) month period, through a subcontract, such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of services pursuant to such subcontract, the subcontractor shall make available, upon written request, to the Secretary of Health and Human Services, the Comptroller General or any of their duly authorized representatives, the subcontract and the books, documents and records that are necessary to verify the nature and extent of the costs of services of the subcontractor.

9.15.  Member Notification of Terminated Providers.  Upon termination of this Agreement for any reason, KFHP shall notify Members of the termination of the Agreement prior to the effective date of termination.

9.16.  Internal Infection Control. Hospital shall develop and implement, in accordance with P.L. 154, No. 13 (codified at 40 P.S. §1303.101 et seq.) known as the Medical Care Availability and Reduction of Error (Mcare) Act, an internal infection control plan that is established for the purpose of improving the health and safety of its patients and health care workers, and that includes effective measures for the detection, control and prevention of Health Care-Associated Infections.

9.17  Recipient Restriction Program. Hospital agrees to cooperate with the recipient restriction of KFHP and the Department.

9.18.  Moral or Religious Objections by Hospital.  Nothing herein shall be construed as requiring KFHP to provide, reimburse for, or provide coverage of a counseling or referral service if Hospital objects to the provision of such services on moral or religious grounds.

9.19.  Coordination with Behavioral Health Providers.  As appropriate, Hospital shall coordinate health care services with the Member's Behavioral Health Providers. Additionally, Hospital shall comply with all applicable laws and regulations pertaining to the confidentiality of Member medical records, including obtaining any required written Member consents to disclose confidential medical records, and in accordance with such laws and regulations: (a) provide a Member's health records if requested by the Behavioral Health Provider, (b) notify Behavioral Health Provider of all prescriptions, and when deemed advisable, check with the Behavioral Health Provider before prescribing the medication, and (c) make certain that Behavioral Health Providers have complete up-to-date records of medications. Hospital shall also make referrals for social, vocational, educational or human services when a need for such services is identified through assessment, and be available to Behavioral Health Providers on a timely basis for consultation.

9.20.  Monitoring of Inpatient Stay. Hospital acknowledges that KFHP's Utilization Management (UM) Department is mandated by the Department to monitor the progress of a Member's inpatient hospital stay. Accordingly, Hospital shall provide to KFHP's UM Department, within two (2) business days from the date

Case ID: 250200219

of admission (unless a shorter timeframe is prescribed by the Provider Manual), all appropriate clinical information that details the Member's admission information, progress to date, and any other pertinent data. Hospital agrees to KFHP's UM Department's monitoring of the appropriateness of a continued inpatient stay beyond approved days according to established criteria, under the direction of the KFHP's Medical Director. As part of the concurrent review process and in order for the KFHP's UM Department to assist with coordination of the discharge plan and arranging additional services, special diagnostics, home care and durable medical equipment, KFHP's UM Department must receive all clinical information on the inpatient stay in a timely manner, which allows for decision and appropriate management of care.

## 10. COOPERATION

To the extent compatible with the separate and independent management of each, KFHP and Hospital shall at all times maintain an effective liaison and close cooperation with each other to provide maximum benefits to Members at the most reasonable cost consistent with high standards of Hospital Services. The parties shall use best efforts to exchange information regarding material matters directly or indirectly related to this Agreement.

## 11. GENERAL TERMS

11.1. Notices required or permitted by this Agreement must be in writing and sent by Certified Mail, Return Receipt Requested, or by an overnight delivery service which provides a written receipt evidencing delivery to the address set forth below by the party, or by confirmed facsimile followed by written notice through the U.S. postal service:

| | |
|---|---|
| If to Hospital: | KINDRED HEALTHCARE<br>680 SOUTH 4TH ST<br>KH-5<br>LOUISVILLE, KY 40202<br>ATTN: Managed Care<br>Email: kindredmanagedcare@kindred.com |
| With a copy to: | General Counsel |
| If to: | KEYSTONE FAMILY HEALTH PLAN<br>200 Stevens Drive<br>Philadelphia, PA 19113 |
| With a copy to: | General Counsel<br>200 Stevens Drive<br>Philadelphia, PA 19113-9966 |

Notices will be deemed given on the date of delivery or receipt. Either party may change its notice address by giving the other party ten (10) days written notice of such change.

11.2. Neither this Agreement nor any of the rights or obligations of either party hereunder may be assigned or transferred by either party without the written consent of the other party.

11.3. All of the clauses of this Agreement are distinct and severable and if any clause shall be deemed illegal or unenforceable for any reason, it shall not affect the legality and enforceability of any other clause of this Agreement.

11.4. The failure of either of the parties to insist upon strict performance of any of the terms of this Agreement shall not be deemed a waiver of any of their respective rights or remedies, and shall not be deemed a waiver of any subsequent breach or default of any of the terms contained in this Agreement.

11.5. All captions contained in this Agreement are solely for the convenience of the parties hereto and shall not be deemed part of the content of this Agreement.

Case ID: 250200219

11.6. All terms used in this Agreement are deemed to refer to the masculine, feminine, neuter, singular or plural as the content may require.

11.7. This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

11.8. The terms and provisions herein contained constitute the entire agreement between the parties hereto concerning the subject hereof. This Agreement supersedes all prior written or oral communications, representations, agreements or understandings existing between the parties concerning the subject matter hereof, including, but not limited to, any such agreement which may have been executed between Hospital and KFHP or one of its Affiliates relating to the provision of Covered Services under the Pennsylvania Medical Assistant Program. In the event of a conflict between the terms of this Agreement and the Provider Manual, the terms of this Agreement shall control.

11.9. This Agreement shall not create nor be deemed or construed to create any relationship between KFHP and Hospital other than that of independent contractors contracting with each other solely for the purpose of performing this Agreement. Neither KFHP nor Hospital shall assume or be responsible for the acts, omissions, liabilities, debts or other obligations of the other party, other than as specifically set forth in this Agreement.

11.10. The parties will use reasonable care and due diligence in performing this Agreement. Hospital will be solely responsible for the health care services Hospital performs under this Agreement.

11.11. No alterations or modifications of the terms of this Agreement shall be valid unless made in writing and signed by both parties hereto. Any amendment to this Agreement subject to prior regulatory approval(s) shall be effective once such regulatory approval(s) has been received. Notwithstanding the foregoing, amendments required because of legislative, regulatory or governmental agency requirements do not require the consent of Hospital or KFHP and shall be effective immediately on the effective date thereof.

11.12. Both parties agree that there shall be no discrimination in the performance of this Agreement against any patient or other person as the result of that individual's race, color, religion, gender, sexual orientation, handicap, age, national origin, source of payment, or any other basis prohibited by law.

[SIGNATURES ON FOLLOWING PAGE; REMAINDER OF PAGE INTENTIONALLY BLANK]

Case ID: 250200219

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto, each by its officers duly authorized, hereby affix their hands and seals as of the date written below.

**KINDRED HOSPITALS EAST LLC**

**KEYSTONE FAMILY HEALTH PLAN**

Audra Early, SVP   Strategy and Network Development
Print Name

Signature

Signature
Joanne McFall, Market President

680 S. 4th St.  Louisville, KY  40202  Attn: Managed Care
Address

7/10/19
Date

National Provider ID Number

July 1, 2019
Effective Date of the Agreement

Medical Assistance ID Number

52-2085555
Hospital Tax ID Number

7/1/2019
Date

Case ID: 250200219

# Appendix A

## Plan Benefits

Hospital shall provide to Members the following medical services: inpatient hospital services; ancillary services and other outpatient services.

## Hospital Rates

For the period beginning July 1, 2019, KFHP will compensate Hospital for all Medically Necessary Plan Benefits rendered by Hospital to Members in accordance with the attached Schedule A-1. However, in no event will KFHP's payment exceed charges.

Case ID: 250200219

# Schedule A-1

## Hospital Compensation

INPATIENT HEALTH SERVICES. For the provision inpatient services rendered by Hospital to Member during an inpatient admission, Hospital shall be paid by KFHP pursuant to the tables below, less any applicable Member co-payment, coinsurance or deductibles. Rates set forth will be considered payment in full, less any applicable Member expenses:

INPATIENT RATES: MEDICAID PRODUCTS

| Service | Billing Codes | Rates |
|---------|---------------|-------|
| Medical/Surgical | Revenue Codes:<br><br>100-101, 110, 111, 112, 113, 117, 119, 120, 121, 122, 123, 127, 129, 130, 131, 132, 133, 137, 139, 140, 141, 142, 143, 147, 149, 150, 151, 152, 153, 157, 159, 160, 164, 167, 169 | REDACTED |
| ICU/Intermediate ICU | 200-203, 206, 214 | |

INPATIENT CARVE OUT RATES: All Paid in Addition to Applicable Per Diem Rates

| Service | Billing Codes | Rates |
|---------|---------------|-------|
| Ventilator | Revenue Codes: 419 with any of the above listed Revenue Codes | REDACTED |
| Dialysis | Revenue Codes:<br><br>800-809 | |
| High Cost Drugs | Revenue Code: 636 | |

Case ID: 250200219

EXCLUSIONS:

| | Billing Codes | Rates |
|---|---|---|
| Physician Fees & Professional Fees | | To Be Billed to Plan Directly By Physician & or other Third Party Entity. |
| Services not provided within each Kindred Hospital | | To Be Billed to Plan Directly by provider of service. |
| Transportation | | To Be Billed to Plan Directly by provider of service. |

- Hospital Rates include all hospital charges only and excludes Physician Fees or other third-party entity/provider charges unless specifically noted.

- Health Plan agrees that if Hospital cooperates with KFHP through its Participating Health Care Providers and KFHP's utilization management staff to coordinate discharge planning of Covered Persons and cannot find a network or approved out of network option willing to accept the patient then KFHP will continue to reimburse Hospital at the agreed upon rate in this Attachment until Hospital and/or KFHP finds an appropriate network or approved out of network discharge option.

- Revenue Codes may be updated due to a change of service, legislation or Medicare/UBC revisions. Hospital shall make best efforts to provide KFHP with 15 days prior notice to effective date of change. KFHP shall represent to Kindred Hospitals that KFHP's systems are capable of correctly adjudicating claims according to the Revenue Codes listed in this agreement.

- Plan and Hospital agree to hold Quarterly Joint Operating Committee Meetings.

Case ID: 250200219

## Kindred Hospitals Philadelphia

| Legal Name | DBA | Address | Tax ID# | NPI# | Remit address |
|---|---|---|---|---|---|
| Kindred Hospitals East, LLC | Kindred Hospital - Philadelphia | 6129 Palmetto St. Philadelphia, PA 19111 | 52-2085555 | 1306918040 | Dept. 4614, PO Box 822629 Philadelphia, PA 19182-2629 |
| Kindred Hospitals East, LLC | Kindred Hospital Philadelphia - Havertown | 2000 Old West Chester Pike Havertown, PA 19083 | 52-2085555 | 1235333089 | Dept. 4510, PO Box 822629 Philadelphia, PA 19182-2629 |

Case ID: 250200219